**WEST BEND MUTUAL INSURANCE COMPANY, Appellant,**

v.

**IOWA IRON WORKS, INC., Appellee.**

No. 92–826.

Supreme Court of Iowa.

July 21, 1993.

Vicki L. Seeck of Betty, Neuman & McMahon, Davenport, for appellant.

Kelly R. Baier and Melissa Weets Anderson of Bradley & Riley, P.C., Cedar Rapids, for appellee.

Considered by HARRIS, P.J., and LARSON, CARTER, LAVORATO, and SNELL, JJ.

HARRIS, Justice.

The question in this interlocutory appeal is whether an insurer has the duty to defend an environmental suit brought by the department of natural resources against a manufacturer. The challenged district court ruling did not address the merits of the underlying suit; neither did it pass on any duty to indemnify in the event of liability. We agree that the insurer had a duty to defend and thus we affirm.

Defendant Iowa Iron Works, Inc. (Iowa Iron) owns and operates a steel foundry in Cedar Rapids. Its molding process requires the use of ordinary river sand that must be replaced from time to time with fresh sand. Albert Schultz requested Iowa Iron to deliver spent foundry sand to his property for use in filling and landscaping the site of an old quarry. Iowa Iron did so.

The Iowa department of natural resources (DNR) brought the underlying suit against both Schultz and Iowa Iron alleging the violation of sanitary disposal laws. The DNR alleged the depositing of a solid waste on property which was not an approved sanitary disposal project violated Iowa Code section 455B.307 (1989) and 567 Iowa Administrative Code sections 101.1, .3(1). Iowa Iron admits delivering sand but disputes any claim it was acidic. On submission of the summary judgment motion, Iowa Iron offered test results indicating the spent sand was innocuous and even beneficial.

When sued by DNR, Iowa Iron sought defense and indemnification under a liability insurance policy it had purchased from West Bend Mutual Insurance Co. (West Bend). West Bend then brought this declaratory judgment action, seeking a declaration that it has neither a duty to defend nor to indemnify. Both Iowa Iron and West Bend filed motions for summary judgment on both issues.

The district court determined that West Bend must defend the DNR lawsuit. The court did not decide whether there was a duty to indemnify, holding this question could be answered only upon conclusion of the litigation between DNR and Iowa Iron. West Bend's interlocutory appeal concerns only the issue of its duty to defend. The underlying lawsuit between the DNR and Iowa Iron remains pending in district court.

■ I. For us to affirm the grant of a motion for summary judgment, the evidence, considered in the light most favorable to the resisting party, must show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Iowa R.Civ.P. 237(c); *Keller v. State*, 475 N.W.2d 174, 179 (Iowa 1991); *Hoefer v. Wisconsin Educ. Ass'n Ins. Trust*, 470 N.W.2d 336, 338–39 (Iowa 1991).

■ Well-settled general principles control the construction and interpretation of insurance policies.

> Construction of an insurance policy—the process of determining its legal effect—is a question of law for the court. Interpretation—the process of determining the meaning of words used—is also a question of law for the court unless it depends on extrinsic evidence or a choice among reasonable inferences to be drawn.

*A.Y. McDonald Indus. v. INA*, 475 N.W.2d 607, 618 (Iowa 1991). When an insurance policy is ambiguous, requires interpretation, or is susceptible to two equally plausible constructions, we adopt the construction most favorable to the insured. *Benzer v. Iowa Mut. Tornado Ins. Ass'n*, 216 N.W.2d 385, 388 (Iowa 1974). This principle of construction is necessary because insurance policies are in the nature of adhesion contracts. *A.Y. McDonald*, 475 N.W.2d at 619. Thus, "[a]n insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations or exclusionary clauses in clear and explicit terms." *Benzer*, 216 N.W.2d at 388. The burden of proving that coverage is excluded by an exclusion or exception in the policy rests upon the insurer. *Brammer v. Allied Mut. Ins. Co.*, 182 N.W.2d 169, 174 (Iowa 1970).

■ An insurance policy "should be interpreted from a viewpoint of an ordinary person, [a layperson,] not a specialist or expert." *Houselog v. Milwaukee Guardian Ins. Co.*, 473 N.W.2d 52, 54 (Iowa 1991). Thus "[w]hen words are left undefined in a policy [they will not be given] a technical meaning. Rather [they will be given] their ordinary meaning, one which a reasonable person would understand them to mean." *A.Y. McDonald*, 475 N.W.2d at 619.

II. This controversy centers on one of the policy's exclusions; West Bend does not dispute its general responsibility under this policy to defend and indemnify.[1] Our first task is to ascertain the metes and bounds of the exclusion. Our second task is to explore the nature of the claims in the underlying suit. The exclusion applies only if the claims in the underlying suit square with the language of the exclusion. Special care must be taken in this case when comparing the claims with the exclusion because key words in the exclusion appear also in the statutes on which the underlying suit is grounded. The similar terms, however, do not necessarily have identical meanings. In analyzing the word "waste," for example, it is especially important to remember which of the two sources is involved.

■ The exclusion protects West Bend from coverage of claims resulting from the "discharge, disbursal, release or escape of pollutants."[2] The DNR petition alleges violation of Iowa Code section 455B.307 (1989) and 567 Iowa Administrative Code sections 101.1, .3(1).[3]

---

1. The comprehensive general liability policy obligates West Bend to pay "all sums which the insured shall become legally obligated to pay as damages because of ... property damage." We have said "the ordinary meaning of 'damages' is broad enough to include government mandated response or clean-up costs under CERCLA and similar state environmental protection statutes." *A.Y. McDonald*, 475 N.W.2d at 620. We also held that the term "damages" does not include civil penalties imposed under environmental statutes. *Id.* at 626.

2. The pollution exclusion states that the policy does not apply
   (1) to bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
   (a) at or from premises owned, rented or occupied by the named insured;
   (b) at or from any site or location used by or for the named insured or others for the handling, storage, disposal, processing or treatment of waste;
   (c) which are at any time transported, handled, stored, tested, disposed of or processed as waste by or for the named insured or any person or organization for whom the named insured may be legally responsible; or
   (d) at or from any site or location on which the named insured or any contractors or subcontractors working directly or indirectly on behalf of the named insured are performing operations:
   (i) if the pollutants are brought on or to the site or location in connection with such operations; or
   (ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize the pollutants.

(2) to any loss, cost or expense arising out of any governmental direction or request that the named insured test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

3. Iowa Code § 455B.307 provides in part:
   1. A private agency or public agency shall not dump or deposit or permit the dumping or depositing of any solid waste at any place other than a sanitary disposal project approved by the director unless the agency has been granted a permit by the department which allows the dumping or depositing of solid waste on land owned or leased by the agency....
   ....
   3. Any person who violates any provision of part I of this division or any rule or any order adopted or the conditions of any permit or order issued pursuant to part I of this division shall be subject to a civil penalty. The amount of the civil penalty shall be based upon the toxicity and severity of the solid waste as determined by rule, but not to exceed $500 for each day of such violation.

Iowa Code § 455B.301(15) defines solid waste:
   *"Solid waste"* means garbage, refuse, rubbish, and other similar discarded solid or semi-solid materials, including but not limited to such materials resulting from industrial, commercial, agricultural, and domestic activities.... However, this division does not prohibit the use of dirt, stone, brick, or similar inorganic material for fill, landscaping, excavation or grading at places other than a sanitary disposal. Solid

As noted, the word "waste" appears in both the policy's pollution exclusion and the statute upon which the DNR suit is grounded. Although there is overlap, the statutory meaning of waste is broader, including as it does both materials that irritate and contaminate and also materials that do not. The term "waste" as it appears in the policy's definition of pollutants has a more narrow meaning. The policy defines pollutants as "any solid, liquid, gaseous or thermal irritant or contaminate, including smoke, vapor, soot, fumes, acids, alkalides, chemicals, and waste. Waste includes materials to be recycled, reconditioned or reclaimed." In view of the last sentence quoted, it is arguable that the definition of waste is sufficiently broad to include innocuous rubbish. But such an understanding is not required; the last sentence could also be understood to refer to only those contaminants and irritants that are targeted for recycling, reconditioning or reclamation. This limited understanding seems more consistent with the location of the language within a pollution exclusion. West Bend, at best, can claim an ambiguity and, under the cited rule of construction, must yield to the meaning most favorable to the insured.

DNR's claim against Iowa Iron is not specifically directed to, much less is it limited to, the disposal of irritants or contaminants. The underlying suit is grounded broadly on a violation of the statutory prohibition against depositing solid waste in an unlicensed place. Such violations are not necessarily based on contaminant or irritant materials.

We think the trial court correctly determined that the DNR suit is grounded on a claim broader than the limits of the policy's pollution exclusion. The trial court adjudi-

cation, finding the duty to defend, was thus correct.

■ III. There can be no coverage under the policy unless there is an "occurrence." West Bend argues it follows there can be no insurance coverage because the DNR lawsuit does not allege an "occurrence." The policy defines occurrence as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Under this definition two things, causally connected, must happen: (1) an accident; and (2) personal injury or property damage neither expected nor intended from the standpoint of the insured.

West Bend correctly points out that Iowa Iron knowingly and deliberately hauled foundry sand to and deposited it at the Schultz farm. West Bend thinks this agreed fact belies any claim that an accident occurred. Our general understanding of the word "accident" lends some support to this contention. *Weber v. IMT Ins. Co.*, 462 N.W.2d 283, 287 (Iowa 1990) ("accident" defined as "an event which, under the circumstances, is unusual and unexpected"). We have defined the term "expected" as used in insurance policies to denote "the actor knew or should have known there was a substantial probability that certain consequences will result from his [or her] actions." *Amco Ins. v. Haht*, 490 N.W.2d 843, 845 (Iowa 1992).

West Bend's position on occurrence was however rejected in *First Newton National Bank v. General Casualty Co.*, 426 N.W.2d 618 (1988). There we addressed a multiperil insurance policy with an identical definition of occurrence as the one in this case. *Id.* at 624–25. We explicitly added a

---

Waste does not include hazardous waste as defined in section 455B.411....

Iowa Code § 455B.411(4)(a), in turn, defines hazardous waste:

"*Hazardous waste*" means a waste or combination of wastes that, because of its quantity, concentration, biological degradation, leeching from precipitation, or physical, chemical, or infectious characteristics, has either of the following effects:

(1) Causes, or significantly contributes to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness.

(2) Poses a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed. "Hazardous waste" may include but is not limited to wastes that are toxic, corrosive or flammable or irritants, strong sensitizers or explosives.

requirement to the policy's definition of occurrence. We said: "[a]n accident, happening, event, or exposure to conditions is an unexpected and unintended 'occurrence' so long as the insured does not expect or intend both it *and* some injury." *Id.* at 625. Under this authority the depositing of the sand, although intentional, is an occurrence under the policy unless Iowa Iron intended "some injury." Because the DNR petition does not allege that Iowa Iron intended some injury, an occurrence is alleged. West Bend's duty to defend cannot be avoided for want of an "occurrence."

IV. We are not persuaded by West Bend's contention that the DNR suit fails to claim property damage. In *A.Y. Mc-Donald,* 475 N.W.2d at 662–63, we held under identical policy language that response or clean-up costs faced by insureds charged with environmental violations "are essentially compensatory damages for injury to government property."

■ V. Under these circumstances the trial court acted correctly and prudently in declining to address the indemnity question. Often, perhaps in a majority of cases, the duty-to-defend issue can turn on whether there is a duty to indemnify. It is clear, in the absence of a special policy provision, that no duty to defend exists where it clearly appears there is no duty to indemnify. And where it clearly appears there is a duty to indemnify, there exists a duty to defend. The difficulty arises where resolution of the indemnity issue does not readily appear, pending resolution of the underlying suit. In *A.Y. McDonald* we pointed out:

> An insurer's duty to defend is separate from its duty to indemnify; the duty to defend is broader than the duty to indemnify. The duty [to defend] arises "whenever there is potential or possible liability to indemnify the insured based on the facts appearing at the outset of the case."

*A.Y. McDonald Indus.,* 475 N.W.2d at 627. We agree with the trial court that the question regarding the indemnification issue cannot be resolved prior to trial of the DNR suit.

The trial court was correct in finding a duty to defend.

**AFFIRMED.**