**DES MOINES REGISTER AND TRIBUNE COMPANY and Iowa Freedom of Information Council, Appellants,**

v.

**John F. DWYER and Jerry Gamble, Appellees.**

No. 94–901.

Supreme Court of Iowa.

Jan. 17, 1996.

Michael A. Giudicessi and K.J. Walker of Faegre & Benson, Des Moines, for appellants.

Brent R. Appel and David S. Steward of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellee Dwyer.

Thomas J. Miller, Attorney General, Julie Pottorff, Deputy Attorney General, and Grant R. Dugdale, Assistant Attorney General, for appellee Gamble.

SNELL, Justice.

In this case, we are faced with the issue of whether the Iowa Senate's policy on release of certain long distance phone records falls within its constitutionally-granted power to determine its own rules of proceedings. The Des Moines Register sought access to detailed phone records kept by the senate and the Department of General Services and sought a declaratory judgment when the senate and general services refused to release the records at issue. The district court ruled that the senate's policy involved a textually demonstrable constitutional commitment of power to the senate and therefore the matter constituted a nonjusticiable political question. On this ground the trial court granted appellees' motion for summary judgment. We affirm.

I. Factual and Procedural Background

As secretary of the Iowa Senate, John F. Dwyer oversees all senate administrative matters, including senate recordkeeping. Dwyer functions under the supervision of the leadership of the senate.

General Services, an executive branch agency, provides telephone service to all state agencies and the senate. This service includes processing and storage of data, production of monthly telephone accounts and billing invoices, and servicing of lines and equipment. Outgoing long distance calls pass through general services equipment, and incoming long distance calls pass from a long distance carrier through general services equipment and then to the state body. For incoming long distance telephone calls billed to the senate, general services sends monthly bills to the senate and the senate transfers money to the department through the Department of Revenue and Finance. After receiving the money, General Services then pays the long distance carrier.

General Services provides two types of monthly bills for the senate. The first type is referred to as a "recap" and provides summary information which indicates the total amount due. The other type of bill, referred to as a "call detail," indicates the charges for specific senate telephones, indicates who the telephone is assigned to, shows the telephone number called or the number from which the call was placed, indicates the date and time of the call, and also indicates the length of the call. General Services retains records of the billing information on these two types of bills for three months on computer and then for three years on microfiche in case the senate needs to access the information. Jerry Gamble is currently the administrator of the administrative services division of the Department of General Services, and his responsibilities include billing state agencies for communications services and overseeing accounting for the department.

On March 9, 1993, Tom Witosky, a reporter for the Des Moines Register, sent a written request to Dwyer for production of all bills, records, summaries, or other documents relating to the use of any incoming or outgoing "800–Watts" telephone line paid for by the Iowa Senate or General Assembly during the calendar years 1990 through 1993. Witosky cited Iowa Code chapter 22, Iowa's open records law, as authority for his request.

Dwyer sent the Register copies of "recap" telephone billing summary reports which showed the total long distance charges for each senate telephone. Dwyer, however, indicated by letter the senate did not have "call detail records" which indicated the originating number, location, date, and time of calls made on an incoming "800–Watts line" to the Iowa Senate. Further, Dwyer stated even if the senate did retain such records, it was his position that production of such documents would violate privacy rights and constitutional guarantees of freedom of speech and would have a detrimental chilling effect on citizens' rights and willingness to petition their elected officials.

Witosky subsequently sent Dwyer a letter of clarification which essentially repeated the initial request but broadened the request by deleting the reference to an "800–Watts" telephone line. On June 4, 1993, Dwyer ultimately sent Witosky another letter which included 324 pages of information regarding charges for equipment, outgoing long distance, and miscellaneous charges for the requested time period. In the letter, Dwyer indicated he would not release "call detail" information about long distance calls because he believed such production would violate the constitutional rights of the parties to the conversations and would improperly differentiate between those individuals who communicated with the senate via long distance telephone calls and those who were able to communicate with senate members by other means.

Soon after Witosky sent his initial request to Dwyer, he sent a request for production of the same long-distance telephone call documents to Jerry Gamble, the director of administrative services at general services. Gamble apparently completely denied the request on the ground he was not the legal custodian of senate telephone records.

In September of 1993, the senate Rules and Administration Committee asked Dwyer to draft a policy regarding public access to senate telephone records. On September 28, 1993, the committee adopted a revised version of Dwyer's recommendation. The adopted policy described the precise policy Dwyer had followed in response to Witosky's request: the public would have unfettered access to all records which did not show itemized call detail, but call detail information would remain confidential. Dwyer circulated the written policy to all members of the senate on September 30, 1993. On October 20, 1993, the senate president and majority leader circulated a memorandum which discussed the details of the written policy.

On November 23, 1993, the Register and Council filed suit against Dwyer and Gamble in the Iowa District Court for Polk County arguing it was their right pursuant to Iowa Code chapter 22 to access senate call detail information and the law required Dwyer and Gamble, as legal custodians of the records, to release them upon a proper request. The Register and Council sought a declaratory judgment that the long distance call detail records were public records and both Dwyer and Gamble violated the open records law by refusing to produce the records. Dwyer ultimately responded by filing a motion for summary judgment in which he asserted the court could not force the release of the records because the senate's policy on release of the records fell within the sphere of the senate's prerogative under article III, section 9 of the Iowa Constitution to determine its rules of proceedings. Gamble later joined in Dwyer's motion.

The Register and Council resisted the motion for summary judgment essentially on the grounds that issues of material fact existed and even if no such issues existed, the court could enforce the provisions of chapter 22 against the senate for numerous reasons including that the policy did not constitute a protected rule of proceeding. The court subsequently granted the defendants' motion for summary judgment on the ground that the senate's policy on release of the records constituted a rule of proceeding and the court could not constitutionally enforce the senate's rules of proceedings. Therefore, the court reasoned, the issue involved a nonjusticiable political question.

On appeal, the Register and Council contend the trial court erred in granting the defendants' motion for summary judgment for the following reasons: (1) the court improperly applied the political question and

separation of powers doctrines because it interpreted "rules of proceedings" too broadly; (2) the court erred in granting summary judgment in favor of Gamble on the ground the matter was a nonjusticiable legislative issue because Gamble is an executive branch employee who serves as the lawful custodian of executive branch documents; (3) genuine issues of material fact exist regarding whether the policy at issue is a rule of proceeding and whether such a rule can be applied retroactively; and (4) the court erred in granting the defendants' motion to strike the plaintiffs' jury demand because the essential nature of the case was legal.

## II. Scope of Review

■ In our review of a trial court grant of a motion for summary judgment, we consider the evidence in the entire record in the light most favorable to the non-movant and determine whether any issue as to any material fact exists. *Ciha v. Irons*, 509 N.W.2d 492, 493 (Iowa 1993); *West Bend Mut. Ins. Co. v. Iowa Iron Works, Inc.*, 503 N.W.2d 596, 598 (Iowa 1993). Summary judgment is appropriate if no issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. *Ciha*, 509 N.W.2d at 493; *West Bend Mut. Ins.*, 503 N.W.2d at 598. An issue of fact is "material" only if the dispute involves facts which might affect the outcome of the suit, given the applicable governing law. *Junkins v. Branstad*, 421 N.W.2d 130, 132 (Iowa 1988). We additionally review the district court's decision to ensure that the court correctly applied the law. Iowa R.App.P. 4; *Ciha*, 509 N.W.2d at 493; *Keller v. State*, 475 N.W.2d 174, 179 (Iowa 1991); *Junkins*, 421 N.W.2d at 132. We review constitutional issues de novo. *State v. Scott*, 518 N.W.2d 347, 349 (Iowa 1994); *State v. Riley*, 501 N.W.2d 487, 488 (Iowa 1993); *State v. Hilleshiem*, 291 N.W.2d 314, 316 (Iowa 1980); *State v. Aschenbrenner*, 289 N.W.2d 618, 619 (Iowa 1980); *State v. Post*, 286 N.W.2d 195, 199 (Iowa 1979); *see Abood v. League of Women Voters*, 743 P.2d 333, 335 (Alaska 1987).

## III. Justiciability

■ It is a firmly-established principle that when a challenge to a legislative action involves a "political question," the judiciary may not intervene or attempt to adjudicate the matter. *League of Women Voters*, 743 P.2d at 336; *Abood v. Gorsuch*, 703 P.2d 1158, 1160 (Alaska 1985); *Malone v. Meekins*, 650 P.2d 351, 356 (Alaska 1982). This principle stems primarily from the separation of powers doctrine which requires we leave intact the respective roles and regions of independence of the coordinate branches of government. *Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663, 682 (1962); *League of Women Voters*, 743 P.2d at 336; *Malone*, 650 P.2d at 356, 357. *See also* 1 William Blackstone, *Commentaries on the Laws of England* 164 (13 ed. 1800) ("for it hath not been used aforetime that the justices should in any wise determine the privileges of the . . . parliament . . . the determination and knowledge of that privilege belongs to the . . . parliament and not to the justices"). Whether a matter involves a political question requires a case-by-case inquiry and constitutes a "delicate exercise in constitutional interpretation." *Baker*, 369 U.S. at 210–11, 82 S.Ct. at 706, 7 L.Ed.2d at 681–82; *see League of Women Voters*, 743 P.2d at 336.

■ One or more of the following factors demonstrate the existence of a political question: (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving the issue; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing a lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question. *Baker*, 369 U.S. at 217, 82 S.Ct. at 710, 7 L.Ed.2d at 686; *see Consumers Union v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1347 (D.C.Cir. 1975), *cert. denied*, 423 U.S. 1051, 96 S.Ct. 780, 46 L.Ed.2d 640 (1976); *League of Wom-*

en Voters, 743 P.2d at 337; Gorsuch, 703 P.2d at 1160; Malone, 650 P.2d at 357. The Supreme Court has explained that whether the political question doctrine applies requires an examination of the nature of the underlying claim. Powell v. McCormack, 395 U.S. 486, 521, 89 S.Ct. 1944, 1964, 23 L.Ed.2d 491, 517 (1969).

At issue in this case is the first factor listed above: namely, whether a textually demonstrable constitutional commitment to the senate renders nonjusticiable the senate's decision to keep specific detailed phone records confidential. The text of the Iowa Constitution commits to the senate the power to determine its own rules of proceedings. The Iowa Constitution, article III, section 9 states as follows:

> Each house shall sit upon its own adjournments, keep a journal of its proceedings, and publish the same; *determine its rules of proceedings,* punish members for disorderly behavior, and with the consent of two-thirds, expel a member, but not a second time for the same offense; and shall have all other powers necessary for a branch of the general assembly of a free and independent state.

(Emphasis added.)

█ It is within the power of the judiciary to review the senate's rules for constitutionality and to ensure they do not violate individual fundamental rights. United States v. Smith, 286 U.S. 6, 33, 52 S.Ct. 475, 478, 76 L.Ed. 954, 958 (1932); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); Exxon Corp. v. Federal Trade Comm'n, 589 F.2d 582, 590 (D.C.Cir.1978), cert. denied, 441 U.S. 943, 99 S.Ct. 2160, 60 L.Ed.2d 1044 (1979); League of Women Voters, 743 P.2d at 336–38; State ex rel. X–Cel Stores, Inc. v. Lee, 122 Fla. 685, 166 So. 568, 571 (1936); Dye v. State ex rel. Hale, 507 So.2d 332, 345 (Miss.1987); Sweeney v. Tucker, 473 Pa. 493, 375 A.2d 698, 709 (1977); State ex rel. Lynch v. Conta, 71 Wis.2d 662, 239 N.W.2d 313, 335 (1976).

█ It is entirely the prerogative of the legislature, however, to make, interpret, and enforce its own procedural rules, and the judiciary cannot compel the legislature to act in accordance with its own procedural rules so long as constitutional questions are not implicated. League of Women Voters, 743 P.2d at 336; Moffitt v. Willis, 459 So.2d 1018, 1022 (Fla.1984). Furthermore, the legislature has complete control and discretion whether it shall observe, enforce, waive, suspend, or disregard its own rules of procedure, and violations of such rules are not grounds for the voiding of legislation. Carlton v. Grimes, 237 Iowa 912, 923, 23 N.W.2d 883, 889 (1946); see also League of Women Voters, 743 P.2d at 338; Moffitt, 459 So.2d at 1021; Lee, 166 So. at 571; State ex rel. Todd v. Essling, 268 Minn. 151, 128 N.W.2d 307, 318 (1964); Conta, 239 N.W.2d at 335; cf. Smith v. City of Dubuque, 376 N.W.2d 602, 605 (Iowa 1985) (city council may abolish, suspend, modify, or waive parliamentary rules and courts will not ordinarily invalidate council action taken in disregard of parliamentary rule).

The question here is not one involving a preservation of the independence of the judiciary in construing and interpreting statutes as suggested by the Register and Council but of recognizing and respecting the prerogatives of the Iowa Senate as committed to it by the Iowa Constitution. To view it as a matter of protecting our judicial independence from legislative incursions inappropriately inverts the legal posture of the case. This is because a study of the scope of chapter 22, The Open Records Statute, does not, nay cannot precede our authority and duty to first determine what rights are exclusively given to the legislature by our Constitution. Were it otherwise, we could always preempt a consideration of a constitutional question involving the legislature's exclusive domain where a statute could be interpreted to apply to the legislature itself. We believe that to embrace an imbalance of this magnitude between the judicial and legislative branches would be inconsistent with the principle of respect due to co-equal branches and would undermine the founded independence of all three branches of state government.

In Cliff v. Parsons, 90 Iowa 665, 57 N.W. 599 (1894), our court assessed the conflict between a statute alleged to limit the senate's power to choose its own officers and the

senate's authority under article III, section 7 of the Iowa Constitution. We said

> Neither house has power to control the other in choosing its officers, nor in fixing their terms of office, nor has any general assembly power to control the right of either house of any subsequent general assembly in this respect.

*Id.* at 672; 57 N.W. at 601.

Relying on *Cliff v. Parsons,* the Iowa attorney general in a 1969 opinion emphasized the force of constitutional language granting authority. The attorney general stated

> The right of each house to choose its own officers is derived from the Constitution whereas § 2.6 of the Code rises to the dignity only of a mere statutory enactment.
>
> . . . .
>
> In light of the language of the supreme court in *Cliff v. Parsons,* supra, it is our opinion that either house or both houses could provide by rule, joint rule, resolution, joint resolution or statute that the terms of officers should carry over from the first session to the second. *But even if this were done, Article III, § 7 would permit either house at any time to terminate the term of any officer and replace him with another, nor could any general assembly, as distinguished from a session thereof, bind a subsequent general assembly in these respects.*

1970 Op.Att'y Gen. 66 (March 24, 1969) (emphasis added).

In 1973, the Iowa attorney general specifically addressed the question of resolving a conflict between the open meetings law, then chapter 68A, now chapter 22, and article III, section 9 of the Iowa Constitution. He concluded the open meetings law was not applicable to sessions or committee activities of the houses of the general assembly. Even if it were, the attorney general stated

> More important, however, is the constitutional power of each house of the General Assembly under Article III, § 9, to determine its own rules of proceedings.
>
> . . . .
>
> In our opinion even if the Legislature were to amend Chapter 28A to specifically

include itself and its various committees, either house could nevertheless thereafter at any time by rule and without the concurrence of the other house close its sessions, committee meetings or any of them. *No mere statute of one General Assembly can abridge the power conferred by the people upon each house to "determine its rules of proceedings."*

1974 Op.Att'y Gen. 41 (February 6, 1973) (emphasis added). *See also League of Women Voters,* 743 P.2d at 338 (whether legislative business should be conducted in open session was a procedural question within the sole constitutional power of each house to determine notwithstanding open meetings statute); *Opinion of the Justices,* 157 Me. 98, 170 A.2d 657, 659 (1961) (the legislature's jurisdiction continues to rest on the authority vested in it by the constitution and may not be made to depend on any technical compliance or failure to comply with such statute); *State ex rel. LaFollette v. Stitt,* 114 Wis.2d 358, 338 N.W.2d 684, 687 (1983) (legislature's adherence to the rules or statutes prescribing procedure is a matter entirely within legislative control and discretion, not subject to judicial review unless the legislative procedure is mandated by the constitution); *Coggin v. Davey,* 233 Ga. 407, 211 S.E.2d 708, 710 (1975) (state open meetings law does not apply to the legislature).

The determinative issue in the case at bar is whether the senate's policy on release of detailed phone records constitutes a senate rule of proceeding. The Register and Council argue the constitutional grant of procedural rule-making authority to the senate does not embrace the actions of individual senators but only actions of the senate as a "body," and because actions of individual senators are at issue here, the matter in controversy is justiciable. Dwyer argues for a broader interpretation of "rules of proceedings" and essentially contends procedural rules encompass any actions carried out in accordance with the constitutional functions of the senate. Inasmuch as privileged communication with constituents is an integral part of the senate's lawmaking process, Dwyer argues, the senate's policy regarding confidentiality of phone records constitutes a

rule of proceeding and senate adherence to such a rule is beyond judicial intervention.

Whether an action constitutes a senatorial proceeding clearly requires a case-by-case analysis, and we do not believe it would be necessary or even feasible to establish a "bright line" definition of a senatorial rule of proceeding as the Register and Council request.

> Justiciability is of course not a legal concept with a fixed content or susceptible of scientific verification. Its utilization is the resultant of many subtle pressures, including the appropriateness of the issues for decision ... and the actual hardships to the litigants of denying them the relief sought.

*League of Women Voters*, 743 P.2d at 336 (quoting *Poe v. Ullman*, 367 U.S. 497, 508–09, 81 S.Ct. 1752, 1759, 6 L.Ed.2d 989, 999 (1961)).

When faced with similar issues, courts have described legislative rules of proceedings as follows: (1) "rules which govern the internal workings of the legislature," *Gorsuch*, 703 P.2d at 1164; *League of Women Voters*, 743 P.2d at 337; (2) statutes which relate "solely to the internal organization of the legislature," *Malone*, 650 P.2d at 356; (3) rules which apply to a "branch of government itself" rather than to "members of [that] body," *Conta*, 239 N.W.2d at 337; (4) "internal rules" which govern " 'acts that occur in the regular course of the legislative process,' " *Consumers Union*, 515 F.2d at 1348 (quoting *United States v. Brewster*, 408 U.S. 501, 525, 92 S.Ct. 2531, 2544, 33 L.Ed.2d 507, 525 (1972)); and (5) "internal operating procedures," *Sweeney*, 375 A.2d at 709.

Courts have generally interpreted legislative rules of proceedings broadly:

> The [constitutional] provision that each House "shall determine the rules of its proceedings" does not restrict the power ... to the mere formulation of standing rules, or the proceedings of the body in ordinary legislative matters; but in the absence of constitutional restraints, ... such authority extends to the determination of the propriety and effect of any action ... taken by the body as it proceeds in the exercise of any power, in the trans-

action of any business, or in the performance of any duty conferred upon it by the Constitution.

*State v. Hagemeister*, 161 Neb. 475, 480, 73 N.W.2d 625, 629 (1955) (quoting *Crawford v. Gilchrist*, 64 Fla. 41, 59 So. 963, 968 (1912)); *see also Opinion of the Justices*, 252 Ala. 205, 40 So.2d 623, 625–26 (1949); *Moffitt*, 459 So.2d at 1021.

> [T]he words in which the grant of power to the Senate to adopt rules of procedure is couched are about as broad and comprehensive as the English language contains, and this court is without the right to ingraft any limitation thereon.

*Witherspoon v. State ex rel. West*, 138 Miss. 310, 103 So. 134, 138 (1925); *see also Dye*, 507 So.2d at 345; *Hagemeister*, 161 Neb. 475, 73 N.W.2d at 628–29.

The Register and Council urge us to adopt the test followed by the California Court of Appeals in *Watson v. California Fair Political Practices Commission*, 217 Cal.App.3d 1059, 266 Cal.Rptr. 408, 414 (1990), as a "bright line" by which we may measure senatorial actions. In *Watson*, the court distinguished "activities engaged in by individual legislators" from "activities by which the Legislature as a whole conducts its business," and held that the former do not fall within the sphere of "rules of proceedings" of the legislature. *Id.* We do not agree that this formulation provides a "bright line" test or even a useful test. Rules which govern senatorial actions, such as voting, which clearly fall within the realm of legislative proceedings beyond the reach of judicial intervention could easily be characterized as either actions of individual senators or actions of the body as a whole. We believe, instead, the *Crawford* formulation, delineated above, provides more useful guidance.

The Iowa Constitution vests the general assembly with the " 'authority to pass rules of law for the government and regulation of people or property.' " *Schneberger v. Board of Social Welfare*, 228 Iowa 399, 404, 291 N.W. 859, 861 (1940) (quoting *Reif v. Barrett*, 355 Ill. 104, 188 N.E. 889, 900 (1933), *overruled on other grounds*, *Thorpe v. Mahin*, 43

Ill.2d 36, 250 N.E.2d 633, 637 (1969)). Public communication with senators is an integral part of the senate's performance of its constitutionally granted authority to enact laws. As Thomas Jefferson noted

[I]n order to give to the will of the people the influence it ought to have, and the information which may enable them to exercise it usefully, it was part of the common law, adopted as the law of this land, that their representatives, in the discharge of their functions, should be free from the cognizance or coercion of the coordinate branches, Judiciary and Executive; and that their communications with their constituents should of right, as of duty also, be free, full, and unawed by any: that so necessary has this intercourse been deemed ..., that the correspondence between the representative and constituent is privileged to pass free of expense through the channel of the public post, and that the proceedings of the legislature have been known to be arrested and suspended at times until the Representatives could go home to their several counties and confer with their constituents.

8 Works of Thomas Jefferson 322–23 (Ford ed. 1904). *See also* Robert J. Reinstein & Harvey A. Silvergate, *Legislative Privilege & the Separation of Powers,* 86 Harv.L.Rev. 1113 (1973).

In order to perform the constitutionally-granted power and duty to enact laws, the Iowa Senate has provided a means by which individuals can communicate their thoughts with senators at public expense. Part of the procedure of the senate as a whole is to communicate on matters of legislation with the public. The phone conversations at the heart of the controversy before us constitute actions taken by the senate as it proceeds in the exercise of its power, in the transaction of its business, and in the performance of duties conferred upon it by the constitution. Recognizing that an accounting of the expenses incurred from use of senate telephone lines is appropriate, the senate authorized Dwyer to provide information that showed the total long distance charges for each senate telephone. This information was given to appellants. The same information was available to General Services as a part of their administrative work and would be reviewable by the state auditor.

The call detail records at issue here were not provided, however, by Dwyer. He believed that distribution of such records would violate senate policy, violate privacy rights and constitutional guarantees of freedom of speech, and would have a chilling effect on our citizens' rights and willingness to contact their elected officials. Similar issues have been considered by the courts of other states. In a New Jersey case, a newspaper sought release by county officials of call detail records like those at issue here. *North Jersey Newspaper Co. v. Freeholders,* 245 N.J.Super. 113, 584 A.2d 275, 276 (App.Div.1990), *modified on other grounds and remanded,* 127 N.J. 9, 601 A.2d 693 (1992). The court held that disclosure was not required, stating

The public certainly has a right to know the total telephone charges paid by the county each month as well as the total charges paid by the county for each telephone assigned to an officer or employee. But it is not, in our view, entitled to know who the recipient of each toll call was, when the call was made, and how long the conversation lasted.

We are also convinced ... that intrusion into the privacy interest one has in his toll billing records could pose significant dangers to political liberty.

. . . .

We do not think it advances the public interest for a person who has spoken to a [county official] on the telephone to be susceptible to inquiries, from the press or otherwise, regarding the nature and substance of the conversation. We do not think a recipient of a telephone call from a [county official] should be subject to any indiscriminate embarrassment or harassment. We can think of little else which would have a more chilling effect on the free and open communication on which elected officials should be able to rely.

*Id.* 584 A.2d at 278–79 (citations omitted).

In *Taylor v. Worrell Enterprises, Inc.,* 242 Va. 219, 409 S.E.2d 136, 137 (1991), a newspaper sought the release of detailed telephone records from the Virginia governor's

office under the Virginia public records statute. The Virginia Supreme Court refused, explaining the legislature intended by statutory exemption to exclude from mandatory disclosure that information which, if required to be released, would unconstitutionally interfere with the ability of the governor to execute the duties of his office. Rejecting the newspaper's argument that the nature of the information was innocuous, the court stated

> On the contrary, data which show the time and originating and terminating location of a call is information concerning the activity of the Governor's office. The data, standing alone, could provide a basis for public speculation. The data also provide an information base for further investigation which would subject recipients of such calls to inquiries regarding the calls and their content.
>
> More importantly, ... compelled release of this information could have a chilling effect on the Governor's use of the telephone for conducting the Commonwealth's business.... The potential chilling effect would operate not only on the Chief Executive but could also extend to individuals he might wish to consult via this communication medium.
>
> . . . .
>
> A lack of candor or an unwillingness to participate in the decision making process is as likely to flow from the compelled disclosure of the fact of consultation as from the disclosure of the content of the consultation.

*Taylor,* 409 S.E.2d at 138–39.

On the federal level, Consumers Union sued when it was denied access to the press galleries of the United States Senate and House of Representatives because it was deemed not to be an "independent publication" as required by senate and house rules. *Consumers Union v. Periodical Correspondents' Ass'n,* 515 F.2d 1341, 1342–43 (D.C.Cir.1975), *cert. denied,* 423 U.S. 1051, 96 S.Ct. 780, 46 L.Ed.2d 640 (1976). The trial court held the case justiciable, and found the rules to be arbitrary, capricious, unreasonable, and violative of the United States Constitution. The court of appeals reversed, holding that Consumers Union's claims were nonjusticiable. The court said

> [W]e are of the opinion that this case is not justiciable because it involves matters committed by the Constitution to the Legislative Department and as to which the acts of the appellants, under the circumstances, did not breach the limits of legislative immunity.

*Id.* at 1346.

The Florida Supreme Court addressed this issue in a suit brought by the Miami Herald Publishing Company and twelve other newspaper publishers against the Speaker of the Florida House and the President of the Senate. *Moffitt v. Willis,* 459 So.2d 1018, 1019 (Fla.1984). They complained secret closed committee meetings violated rules that committee meetings "shall be open to the public." *Id.* at 1021. The plaintiffs asserted that the closed meetings violated the House and Senate rules, the open meetings statute and provisions of the U.S. and Florida constitutions. The trial court held that the plaintiffs were entitled to a ruling on the merits and denied a motion to dismiss. On appeal, the Florida supreme court ordered the case dismissed because rulemaking powers were given exclusively to the legislature:

> At this point, the judiciary comes into head-to-head conflict with the legislative rulemaking prerogative.
>
> Article III, section 4(a) of the Florida Constitution gives each house the power to determine its own rules of procedure. As historically interpreted by this Court, this provision gives each house the power and prerogative not only to adopt, but also to interpret, enforce, waive or suspend whatever procedures it deems necessary or desirable so long as constitutional requirements for the enacting of laws are not violated.
>
> . . . .
>
> It is a legislative prerogative to make, interpret and enforce its own procedural rules and the judiciary cannot compel the legislature to exercise a purely legislative prerogative.
>
> . . . .

Just as the legislature may not invade our province of procedural rulemaking for the court system, we may not invade the legislature's province of internal procedural rulemaking. A member of the legislature can raise a point of order regarding a violation of any of the rules of the house or senate. That is the proper forum for determining the propriety of the activities complained of in the suit below.

*Id.* at 1021–22 (citations omitted).

The Alaska Supreme Court has addressed similar issues. In *Abood v. League of Women Voters,* 743 P.2d 333, 334 (Alaska 1987), a dispute arose over closed committee meetings. The League asserted the legislators had violated their own rules and the Alaska Open Meetings Act. In remanding the case with instructions to dismiss, the court deferred to the legislature:

The Alaska Constitution expressly commits to the legislature authority to adopt its own rules of procedure. The question whether legislative business should be conducted in open or closed session is a procedural question which has traditionally been the subject of legislative rules....

The League asserts that Legislators have violated both the Uniform Rule and the Open Meetings Act. If they have, to hold that these claims are justiciable places the judiciary in direct conflict with the legislature's constitutionally authorized rulemaking prerogative.... As we stated in *Malone,* "except in extraordinary circumstances, as where the rights of persons who are not members of the legislature are involved, it is not the function of the judiciary to require that the legislature follow its own rules." In support of this proposition, we cited *United States v. Smith,* where the Court discussed the rule that the only justiciable limitations on a legislative body's power to adopt rules of its proceedings are that the body may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rules and the result which is sought to be obtained. But within these limitations all matters of method are open to the determination of the house.

*Id.* at 337–38 (quoting *Malone v. Meekins,* 650 P.2d 351, 359 (Alaska 1982); *United States v. Smith,* 286 U.S. 6, 33, 52 S.Ct. 475, 478, 76 L.Ed. 954, 958–59 (1932)).

The Iowa Senate has determined that a wholesale disclosure of its itemized call detail telephone records would be harmful to the public and to the senate's ability to carry out its responsibilities. Implicit in the senate's decision is a citizen's right to contact a legislator in person, by mail, or by telephone without any fear or suspicion that doing so would subject the citizen to inquiries from the press or anyone else regarding the nature of the conversation. Apart from the inconvenience or possible harassment generated, a citizen subjected to inquiry about contacting a senator, may, on refusing to discuss the content, find negative inferences are drawn from that fact alone.

■ The weighing of these factors is indigenous to the political process and is distinctly within the province of the senate. As elected representatives involved with the political process, senators are conditioned to decide political questions. A senatorial policy governing these actions therefore clearly constitutes a "rule of proceeding." We therefore affirm the trial court's ruling that release of the phone records by the senate constitutes a nonjusticiable political question. The proper forum for a challenge of the senate's policy on this matter lies not in the courts, but in the political process. *See Moffitt,* 459 So.2d at 1022.

■ At this juncture we pause to treat three additional contentions of the Register and Council. First, the Register and Council assert once we have established a "correct definition of rules of proceedings," it is a question of fact for the jury to decide whether the senate policy at issue constitutes such a rule. The Register and Council cite no authority whatsoever for this assertion, and we can conceive of no rationale whatsoever to support such a contention. We note no case in which a court has allowed a jury to determine whether such an action constituted a

rule of proceeding. This argument has no merit.

Second, the Register and Council note the senate passed the policy in question *after* Dwyer refused to release the records at issue. The Register and Council therefore suggest a question exists whether the policy can operate retroactively and remark that a question of fact exists regarding whether the senate intended the rule to operate retroactively. We have already noted that the senate's methods of carrying out its rules of proceedings, so long as constitutionally sound, lie beyond the intervention of the judiciary.

> With the exception of the few mandatory provisions noted the Constitution of Iowa has given the general assembly a free hand in determining its rules of procedure. Whether either chamber strictly observes these rules or waives or suspends them is a matter entirely within its own control or discretion, so long as it observes the mandatory requirements of the Constitution. If any of these requirements are covered by its rules, such rules must be obeyed, but the observance or nonobservance of its remaining rules is not subject to review by the courts.

*Carlton v. Grimes,* 237 Iowa 912, 923, 23 N.W.2d 883, 889 (1946).

The Register and Council argue the senate rule may not apply retroactively because the rule was passed after their requests for production of the records. It appears the Register is arguing that simply by writing letters making a request for the records, they have established a vested substantive right to obtain the records, or at least to proceed under the procedures in place at that time. This argument clearly fails for two reasons. First, the senate passed the rule at issue in September of 1993, two months before the Register and Council saw fit to file suit. Secondly, the question of retroactivity itself is moot as the senate in adopting the rule was simply memorializing in writing a policy it had been applying informally all along. Therefore, regardless of whether the written rule is applied retroactively, the same rule is applied, and the same result is reached.

Third, the Register and Council warn us in their brief that "[t]he political question doctrine is a tempting refuge from the adjudication of difficult constitutional claims." *See Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1514 (D.C.Cir.1984), *vacated on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985). Their implicit assertion seems to be that, rather than consider the true merits of this controversy, the district court chose to defer to a simple legal doctrine, and if we do not agree with the arguments of the Register and Council, we will be doing the same. We note we have engaged in a "discriminating inquiry into the precise facts and posture of [this] particular case" and find the challenges raised by the Register and Council against application of the political question doctrine to be without merit. *See Baker,* 369 U.S. at 217, 82 S.Ct. at 710, 7 L.Ed.2d at 686.

### IV. Records in Possession of the Department of General Services

Although Gamble joined in Dwyer's motion for summary judgment, the trial court ruling did not explicitly mention the basis for disposal of the action brought against Gamble. The Register and Council assert the trial court erred in dismissing the action against Gamble because the court's decision regarding justiciability was not dispositive of the matter with regard to Gamble. As to Gamble, the Register and Council claim he oversees an executive department in possession of executive branch records and Gamble is an employee of the executive branch of government, not the legislative. The Register and Council contend Gamble is a legal custodian of the records under Iowa Code chapter 22. Gamble and Dwyer argue that only Dwyer, in his capacity as secretary of the senate, is the legal custodian, and the only party of the two with authority to release the records in question. Gamble and Dwyer additionally argue the records in question are not "public records" within the definition provided in Iowa Code section 22.1(3).

■■ The analysis we have already engaged in regarding the justiciability of this matter is dispositive of whether the Register and Council can maintain an action against

Gamble. The senate's decision to keep the records in question confidential falls within the constitutionally-granted power of the senate to determine its rules of proceedings. *See* Iowa Const. art. III, § 9; *Carlton,* 237 Iowa at 923, 23 N.W.2d at 889. Due to the existence of a textually demonstrable constitutional commitment of the issue to the senate, neither the judiciary, nor the department of general services, a department of the executive branch, hold the power to interfere with or contradict those procedures. *Cf. Baker,* 369 U.S. at 217, 82 S.Ct. at 710, 7 L.Ed.2d at 686; *League of Women Voters,* 743 P.2d at 337; *Consumers Union,* 515 F.2d at 1347; *Gorsuch,* 703 P.2d at 1160; *Malone,* 650 P.2d at 357. Gamble is therefore without authority to release the phone records at issue without the permission of the senate. It would constitute clear judicial and executive interference with the internal procedures of the legislative branch if we were to order an executive branch department to release copies of legislative branch department records when we have already determined it is beyond our authority to order the legislature to release precisely the same records.

The trial court properly granted appellees' motion for summary judgment.

**AFFIRMED.**

All justices concur except HARRIS, J., who dissents, and is joined by LARSON and ANDREASEN, JJ.

HARRIS, Justice. (dissenting).

According to a venerable principle of disputation, the power to frame the question includes also the power to control the answer. Although the majority may have employed the proper analysis it has not reached the correct controlling question and has thus reached the incorrect conclusion. The question should be whether the legislature can suspend a self-imposed statutory obligation without first amending or repealing the statute. The answer should be no. I dissent because I think the trial court should be reversed.

As the majority notes, the political-question doctrine stems primarily from the principle of separation of powers. I enthusiastical-

ly agree that those of us who serve in any branch of government should be scrupulous in according respectful deference to the other branches concerning those matters entrusted to them. I also agree with the majority that the test for determining the existence of a political question is that set out in *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663, 686 (1962). I further concur that the present case involves the first factor of that test: whether there is a textually demonstrable constitutional commitment of the issue to a coordinate political department. Indeed the majority is on solid ground in observing that responsibility and authority for establishing its own rules of proceedings rests with the General Assembly and not the courts.

This is not what is involved here. We are not dealing with rules of proceedings. Rather we are faced with an interpretation of a statute carefully fashioned years ago by the legislature when it provided for open access to public records. The legislature did not fashion this statute without difficulty. On the one hand it had to consider the interest of the taxpayers' right to information on where their dollars were being spent. On the other hand the legislature had also to consider the interests of citizens seeking comfortable access to their elected legislators. Note, *The Iowa Open Meetings Act: A Lesson in Legislative Ineffectiveness,* 62 Iowa L.Rev. 1108, 1113 (1977) (discussing the policies behind the open information acts). I freely acknowledge it was for the legislature to sort through these competing considerations in the legislative process and strike a balance that would be judged in the forum of public opinion. I would be the last to intrude into that process.

What the legislature should not be allowed to do is the very thing authorized by the majority: to resolve the question by enacting the open-records law, now Iowa Code chapter 22 (1995), in favor of access to the information, expressly making the access binding on itself, and then, on an ad hoc determination—actually judicial in nature—to withhold the statute's application. The majority is misguided in according this authority to the legislature on a ground of separation of pow-

ers because to do so abdicates authority that properly belongs exclusively to the courts. Under well established authority, later discussed, it is the province of the legislature to enact the laws, but once enacted it is the exclusive province of the courts to interpret the law.

Once a statute is lawfully enacted, all members of society, even legislators, must comply with its provisions. The General Assembly should be required to abide by Iowa Code chapter 22. A careful analysis of article III section 9 of the Iowa Constitution mandates this conclusion.

I. Three chapters of the Iowa Code control public access to governmental information: the Examination of Public Records Act (open records), Iowa Code chapter 22; the Iowa Administrative Procedure Act (IAPA), Iowa Code chapter 17A; and the Official Meetings Open to Public Act (open meetings), Iowa Code chapter 21. Each of these chapters focuses on a different aspect of the public need for information relating to governmental affairs.

The open records law was enacted in 1967, the same year the open meetings law was adopted. 1967 Iowa Acts ch. 106. It accords citizens the right to examine and copy all "public records." Iowa Code § 22.2(1). The legislature chose to define the term "public records" broadly. According to Code section 22.1(3) the term "public records" includes any "information, stored or preserved in any medium, of or belonging to this state or [other governmental body]." In section 22.1(1) the legislature carefully defined the term "governmental body" to include state government. This is in sharp contrast with its choice in the open meetings law, where in Iowa Code section 21.2(1) a "governmental body" was not defined to include "this state," but was confined to boards, councils, commissions or other governmental bodies created by statute or executive order. Thus the legislature carefully and, it must be assumed, deliberately, crafted the open records law to embrace its own records.

There is also other evidence of legislative intent to make chapter 22 apply to itself. A statutory exception was created to exempt from disclosure records gathered in investi-gations of General Assembly members. *See* Iowa Code § 22.7(30). The legislature thereby acknowledged that an exemption must exist under section 22.7 in order for its own records to escape accessibility under chapter 22. Full access to public records, including legislative records, is promised unless some lawful escape route can be proven.

Two such possibilities are suggested. It is premature to consider the first route because of the posture of this case—an appeal from the grant of summary judgment. The second route is impassable.

II. The first route is suggested by the confidential records exception in Iowa Code section 22.7(18). Under that provision records to be kept confidential include:

Communications not required by law, rule, or procedure that are made to a government body or to any of its employees by identified persons outside of government, to the extent that the government body receiving those communications from such persons outside of government could reasonably believe that those persons would be discouraged from making them to that government body if they were available for general public examination. Notwithstanding this provision:

a. The communication is a public record to the extent that the person outside a government making that communication consents to its treatment as a public record.

b. Information contained in a communication is a public record to the extent that it can be disclosed without directly or indirectly indicating the identity of the person outside a government making it or enabling others to ascertain the identity of that person.

c. [Dealing with law enforcement techniques.]

One can certainly argue, as does the majority, that disclosure of records pertaining to incoming calls from constituents to legislators may "chill" such communications. It is possible that at least some of these types of calls are entitled to protection under the Act. It is less clear whether disclosure of outgoing calls would be protected. The statutory ex-

emption in section 22.7(18) focuses on "[c]ommunications ... made to a government body" and "the government body receiving those communications."

The parties did not litigate this issue because of the trial court's grant of summary judgment. For reasons explained in division III, I think the case should be remanded to district court where the effect of section 22.7(18) can be litigated. It is enough here for me to observe that it provides no basis for a grant of summary judgment.

III. The heart of the dispute is the holding that the General Assembly's prerogative to set its own rules of proceedings authorizes it to suspend operation of a statute it has made binding upon itself. For two reasons I think it cannot. First, not by any stretch of imagination, can I believe this policy, concerning as it does the individual legislator's interface with the public, is a rule of proceeding. Secondly, I am convinced we should persist in our view that the legislature cannot excuse itself from the binding effect of its own enactments without first amending or repealing them.

A. My strongest disagreement with the majority lies with its authorization of the "political question" escape route: a legislative claim of a direct constitutional power used in order to avoid the legal consequences of its own enactments. The "claim" was triggered by a transparent legal ruling. The defendant secretary of the senate, John F. Dwyer, refused to produce call detail records because, he said, "production of such records would violate privacy rights and constitutional guarantees of freedom of speech and would have a detrimental chilling effect on citizens' rights and willingness to petition their elected officials." I am sure Mr. Dwyer is a person of considerable ability but nevertheless is a person who obviously has never taken an oath of judicial office. It cannot be seriously argued that his ruling did not involve interpretation of laws, a function we have vigilantly claimed exclusively for the courts.

We have often expressed our acknowledgment that under the separation of powers doctrine, it is the prerogative of the legislature to declare what the law shall be, but the prerogative of the courts alone to declare what the law is.

*State ex rel. Lankford v. Mundie,* 508 N.W.2d 462, 463 (Iowa 1993). *See also West Des Moines State Bank v. Mills,* 482 N.W.2d 432, 436 (Iowa 1992); *State v. James,* 393 N.W.2d 465, 467 (Iowa 1986); *Ruthven Consol. Sch. Dist. v. Emmetsburg Community Sch. Dist.,* 382 N.W.2d 136, 140 (Iowa 1986); *Franke v. Junko,* 366 N.W.2d 536, 539 (Iowa 1985); *Slockett v. Iowa Valley Community Sch. Dist.,* 359 N.W.2d 446, 448 (Iowa 1984); *Richardson v. City of Jefferson,* 257 Iowa 709, 717, 134 N.W.2d 528, 533 (1965).

Cases can be found that acknowledge a legislature's right to ignore or contradict existing statutes. This view seems to have originated with commentators, such as Blackstone, who were familiar with a system of parliamentary responsibility, in which the parliament did indeed reign supreme, even to the extent of holding final jurisdiction to consider appeals from the courts. This orientation has led many courts to misconstrue a valid principle: one legislative session cannot bind its successors. But this limitation properly exists only in the sense that it cannot bind future legislatures to renew legislation or to be bound not to repeal it. *See Frost v. State,* 172 N.W.2d 575, 583 (Iowa 1969).

In *AFSCME/Iowa Council 61 v. State,* 484 N.W.2d 390, 394–95 (Iowa 1992), we rejected a claim that another constitutional prerogative (budgeting process) provided the General Assembly with justification for violating a contract it entered by way of statute. Although no contract is implicated in the present dispute, *AFSCME* is authority that sessions of our legislature are not free to ignore the effects of enactments of their predecessors.

B. Article III section 9 of the Iowa Constitution accords each house of the General Assembly authority to "determine its rules of proceedings." The trial court interpreted this authority to include the subject matter of this suit, an interpretation I believe to be at odds with the Constitution's plain language. This provision was obviously intended to accord each legislative house the power to es-

tablish a system for the orderly processing of bills. How individual legislators meet or communicate with the public is a matter of considerable importance, but has absolutely nothing to do with the General Assembly's rules of proceedings. *See Watson v. California Fair Political Practices Comm'n,* 217 Cal.App.3d 1059, 266 Cal.Rptr. 408, 413 (2 Dist.1990) (term "rules of proceedings" confined to manner in which a legislature drafts its rules, appropriates its funds, or chooses officers or employees, and does not concern legislators' relationships with constituents); *Sweeney v. Tucker,* 473 Pa. 493, 375 A.2d 698, 708–09 (1977) ("rules of proceedings" defined as internal operating procedures of the legislature).

Cases cited by the majority for support have been misconstrued. Both *Moffitt v. Willis,* 459 So.2d 1018, 1022 (Fla.1989), and *Abood v. League of Women Voters,* 743 P.2d 333, 338 (Alaska 1982), challenge access to legislative committee meetings under state open meetings laws. *Consumers Union v. Periodical Correspondents' Association,* 515 F.2d 1341, 1342–43 (D.C.Cir.1975), *cert. denied,* 423 U.S. 1051, 96 S.Ct. 780, 46 L.Ed.2d 640 (1976), involved accreditation of a member of the media to the periodical press galleries of Congress. Such issues are resolved under Iowa law because the state legislature exempted itself from the open meetings act. The same cannot be said for the open records law.

More pertinent here are two cases involving phone records. *North Jersey Newspaper Co. v. Freeholders,* 245 N.J.Super. 113, 584 A.2d 275, 279 (App.Div.1990), *modified on other grounds and remanded,* 127 N.J. 9, 601 A.2d 693 (1992), denied access to phone records based on privacy interests protected by the Fourth Amendment, while *Taylor v. Worrell Enterprises,* 242 Va. 219, 409 S.E.2d 136, 139–40 (1991), denied access under a statutory exception. Notably, neither court held the matter was a nonjusticiable political question.

Appellate judges writing, as I am, in dissent are often tempted to exaggerate the importance of the holding with which they disagree. I recognize that the immediate fallout from the majority opinion, though profoundly disappointing to me, will not shake the cosmos. The public, if sufficiently motivated, has political ways of acquiring information on the details of public expenditures. What I do find alarming is our surrender of vital ground in the separation of powers. We acquired this ground at considerable cost. In some future controversy the majority holding will surely haunt us.

Like my respected colleagues I have a profound reluctance to question the actions of either other branch of state government. It is however no compliment to them, especially when they are confronted by members of the public, to accord other branches more deference than is proper. Neither is it an insult to them to preserve to our branch those responsibilities exclusively entrusted to us. I think the judgment of the trial court should be reversed and the case remanded for the further proceedings I have described.

LARSON and ANDREASEN, JJ., join this dissent.