**MIDAMERICAN ENERGY COMPANY, Plaintiff,**

v.

**GREAT AMERICAN INSURANCE COMPANY, Defendant.**

**No. C00–4015–MWB.**

United States District Court, N.D. Iowa, Western Division.

Oct. 16, 2001.

A.J. Stoik, Klass, Stoik, Mugan, Villone, Phillips, Orzechowski, Clausen & Lapierre, L.L.P., Sioux City, IA, for Plaintiff.

T. Scott Leo, Leo & Weber, P.C., Chicago, IL, James W. Redmond, Heidman, Redmond, Fredregill, Patterson, Plaza,

Dykstra & Prahl, L.L.P., Sioux City, IA, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNT I OF THE COMPLAINT, DEFENDANT'S MOTION TO ADMIT EVIDENCE OF CERTAIN TEST RESULTS, AND DEFENDANT'S MOTION TO STRIKE AFFIDAVIT**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION AND BACKGROUND* .....................................838
 A. *Procedural Background* ...........................................838
 B. *Factual Background* .............................................839
 1. *Undisputed facts related to motion for summary judgment* ..............839
 2. *Additional facts related to motion to admit evidence* ...................843

II. *LEGAL ANALYSIS* ...............................................844
 A. *Motion To Strike* ..............................................844
 B. *Motion For Summary Judgment* ....................................847
 1. *Standards for summary judgment* ...............................847
 2. *Analysis of arguments* .......................................848
 a. *Liquidated damages provision* ..............................848
 i. *Test for liquidated damages* ..............................849
 ii. *Actual loss or damage caused by the breach* .................850
 iii. *Difficulty of proof of loss* ...............................850
 b. *Time barred* ...........................................851
 C. *Motion To Admit Evidence* .......................................853
 1. *Lack of consideration* .......................................853
 2. *Inequity of enforcement* ......................................854
 3. *Design defect* ..............................................855

III. *CONCLUSION* ................................................855

### I. INTRODUCTION AND BACKGROUND

#### A. Procedural Background

Plaintiff MidAmerican Energy Company ("MidAmerican") filed its complaint in this lawsuit against defendant Great American Insurance Company ("Great American") on February 7, 2000. In its complaint, plaintiff MidAmerican claims that defendant Great American is obligated to pay it for certain breaches of contract under the terms of a performance bond issued by Great American, insuring certain express warranties made by Phoenix Combustion, Inc. ("Phoenix") regarding modifications made by Phoenix to the combustion and boiler system at a MidAmerican power plant. In Count I, MidAmerican alleges that it is entitled to a refund of Phoenix's base bid for the modifications and that Great American is obligated under its performance bond to make this refund. In Count II, MidAmerican asserts that it has incurred costs in correcting defects in

Phoenix's work and that Great American is obligated under its performance bond to pay these costs. Defendant Great American answered the complaint on April 3, 2000, generally denying MidAmerican's allegations.

On June 15, 2001, Great American filed its Motion To Admit Evidence Of Certain Test Results (# 30). In its motion, Great American seeks relief from a written stipulation between MidAmerican and Great American under which MidAmerican agreed to permit Great American to perform certain tests on the burners installed by Phoenix but the results of the testing could not be used as a basis for an expert opinion on the issues of liability and damages under the performance bond. Great American contends that the stipulation is unenforceable because there was no consideration for the stipulation and enforcement of the stipulation would be inequitable in light of changes made to the burners by MidAmerican which prevented Great American from conducting further testing of the burner units. Great American further contends that the test results should be admitted to rebut a design defect claim advanced by MidAmerican. MidAmerican filed a timely response to Great American's motion in which it argues that the court should enforce the stipulation and deny MidAmerican's motion.

Great American also filed its Motion For Summary Judgment on Count I Of The Complaint (# 31). In its motion for summary judgment, Great American contends that the liquidated damages segment of the contract under which MidAmerican seeks recovery is an unenforceable penalty. Great American also argues that MidAmerican's action is time barred under the terms of the contract. On August 2, 2001, MidAmerican filed a timely response to Great American's motion in which it argues that the liquidated damages clause is enforceable and that its action for recovery under the performance is timely. After MidAmerican filed its resistance to Great American's motion for summary judgment, on August 15, 2001, Great American filed a Motion To Strike The Affidavit Of Leon Gertsch. Leon Gertsch's affidavit was filed in support of MidAmerican's resistance to Great American's motion for summary judgment. Great American asserts that certain statements made in Gertsch's affidavit must be stricken because they are not based on the affiant's personal knowledge.

The court heard oral arguments on defendant Great American's motions on October 11, 2001. At the oral arguments, plaintiff MidAmerican was represented by counsel A.J. Stoik of Klass, Stoik, Mugan, Villone, Phillips, Orzechowski, Clausen & Lapierre, L.L.P., Sioux City, Iowa. Defendant Great American was represented by counsel T. Scott Leo of Leo & Weber, P.C., Chicago, Illinois and James W. Redmond, Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl, L.L.P., Sioux City, Iowa.

The court turns to a discussion of the undisputed facts as shown by the record and the parties' submissions, and then to a review of those additional facts related to defendant Great American's motion to admit evidence and motion to strike. Following that discussion, the court will turn to the legal analysis of defendant Great American's three motions.

### B. Factual Background

#### 1. Undisputed facts related to motion for summary judgment

The record reveals that the following facts are undisputed. Plaintiff MidAmerican Energy Company is a corporation organized under the laws of the State of Iowa with its principal place of business in Iowa. Defendant Great American Insurance Company is a corporation organized under the laws of the State of Ohio with its

principal place of business in Ohio. On September 15, 1994, MidAmerican entered into a contract with Phoenix for the modification and improvement of the combustion and boiler system at MidAmerican's George Neal Station Unit 2 power plant. The boiler at the Unit 2 power plant is a coal-fired boiler with 16 burners on the front of the boiler in an array of four four-burner rows. These burners consume pulverized coal which is injected into them by four pulverizers. The pulverizers grind coal, mix the ground coal with air and blow the coal-air mixture into the burners. The mixture leaves the burner tubes through the burner tips where it is ignited and swirled in order to burn more cleanly.

The base sum of the contract with Phoenix for the Unit 2 power plant was $3,111,235.00. The contract required Phoenix to provide a performance bond. On December 27, 1993, Great American issued a performance bond in the amount of $3,111,235.00. The performance bond contained the following limitations period on litigation:

> **9** Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in which the work or part of the work is located and shall be instituted within two years after the Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligation under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

Performance Bond at ¶ 9, attached as Exhibit "A" to Great American's Answer. The performance bond defines a contractual default as:

> **12.3** Contractor Default: Failure of the Contractor. which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract.

Performance Bond at ¶ 12.3, attached as Exhibit "A" to Great American's Answer.

Donald Mohning has worked for MidAmerican for twenty-eight years and in the environmental services department of MidAmerican since 1993. He is responsible for air quality issues within MidAmerican's power plants. Mohning has the most knowledge about the compliance of the Phoenix burners at MidAmerican's George Neal Station Unit 2 power plant.

Todd Van Diepen is the performance engineer for MidAmerican and has occupied that position since 1990. His duties also include monitoring of and writing operational procedures for MidAmerican's power plants, including MidAmerican's George Neal Station Unit 2 power plant. Van Diepen had input into whether the burner system installed by Phoenix met the performance guarantees of the contract. Van Diepen was a member of the committee that prepared the specifications contained in the contract.

The contract contained specific performance requirements and guarantees that were subject to liquidated damages. The guarantees with respect to oxygen included the following:

> Oxygen
>
> a. The ATLAS Integrated Low–$NO_x$ Burner System is designed to achieve all performance guarantees at 4.0% excess $O_2$. To achieve optimum system performance while maintaining all guarantees, Contractor shall be allowed to operate the proposed system at excess $O_2$ levels below 4.0% but not less than 3.0% if required. To maintain unit safety, CO levels will not be permitted to

exceed 100 ppm on a continued basis.

Contract, Article 5, § 5.3.2(a), at PR–12, attached as Exhibit "C" to Great American's Statement of Material Facts. The contract contained a further guarantee that "$NO_x$ emissions shall not exceed 0.45 # /Million Btu." *Id.* at Article 5, § 5.2.3, at PR–11. Similarly, the contract contained a guarantee that "The level of CO shall not exceed 100 ppm at the economizer outlet and 500 ppm on the furnace wall under the bottom row(s) of burners." *Id.* at Article 5, § 5.2.4, at PR–11. The contract called for "$NO_x$ emissions measurement will be as provided by the Neal Station Unit 2 Continuous Emissions monitor." *Id.*, Article 3, § 3.3.2, at PR–5.

Testing showed that the Phoenix burners had trouble meeting the contract's 100 ppm requirement for CO, though some tests indicated that the burners are capable of meeting this requirement. The contract provided for the following specific testing conditions:

Testing Conditions

The testing conditions for the Performance Guarantee Testing of the unit's operating characteristics, while operating at a fixed load shall be as follows and in accordance with Table PR1.

The MCR testing will be established while maintaining between 3.0% and 4.0% oxygen at the economizer exit. The test will be conducted with all mills in service and balanced. Reheat (RH) and Superheat (SH) steam temperatures are to be 1000F̄ at the boiler outlet. This test will be conducted on both 100% Hanna Basin and a blend of 50% Hanna Basin and 50% Powder River Basin coals. Each of the tests will be tested again in 6–7 months following the initial testing. The unit lead for testing will be as listed:

Base Bid Proposal

The Maximum Continuous Rating (MCR) load test will be at (300 MW net) 2,200 KPPH when firing 100% Hanna Basin Coal and (300 MW net) 2,200 KPPH when firing a blend of 50% Hanna Basin and 50% Powder River Basin Coal.

*Id.*, Article 3, §§ 3.4.2–3.4.2.2, at PR–6–7.

The contract provided for liquidated damages in certain cases. The contract specifically provided that:

General

The Contractor shall meet all guarantees specified by the Bid Documents and provided by the Contractor on the $NO_x$ Reduction Work and specified and required by the Capacity Recovery modifications. Should the contractor be unable to comply with all of the guarantees required, then the Owner, at his sole option, may allow for payment of liquidated damages in lieu of compliance with those guarantees called out in Article 5.3. The Contractor shall meet all guarantees called out in Article 5.3. The Contractor shall meet all guarantees requiring strict compliance.

*Id.* at Article 6, § 6.1, at PR–13. The Contract also contained the following liquidated damages provision for nitrogen oxide nonattainment:

$NO_x$ Nonattainment

In the event $NO_x$ limits cannot be attained even with violation of the guarantees as defined by Article 5.3, the Contractor shall supply and install replacement burners of an advanced design or refund the Base price of the Contract at the Owner's option. The Contractor shall perform all modifications, adjustments, revisions and replacements required to attain the required $NO_x$ limitations. Under no conditions shall the economizer's exit CO be permitted to exceed 100 ppm.

*Id.* at Article 6, § 6.2.1, at PR–13. With respect to Oxygen levels, the contract contained the following liquidated damages provision:

Oxygen

$O_2$ in flue gas—$6,000/yr per tenth of a percentage point for each tenth of a percentage point over 4.0 percent.

*Id.* at Article 6, § 6.4, at PR–13.

In drafting the contract, MidAmerican determined the value for the various liquidated damages from the following information: lab tests, impact modeling, efficiency loss, and prior costs of operating the George Neal Station Unit 2 power plant. Based on that information, MidAmerican calculated the individual dollar amounts for each respective liquidated damage provision.

MidAmerican believes that the contract's CO emission requirement is part of the contract's $NO_x$ guarantees. In the fall of 1995, Phoenix installed new low $NO_x$ burners and a rear over-fire air system. This system injected air along the rear of the boiler wall. MidAmerican first determined that Phoenix was having trouble meeting the performance requirements of the contract during Phoenix's first testing of the burners after the start-up time in late 1995. At that time, Phoenix could not get the $NO_x$ levels down to close to the contract's guarantee levels. MidAmerican was concerned about Phoenix's overfire air system shortly after start-up when Phoenix could not meet the contract's $NO_x$ guarantee. MidAmerican's concerns developed within a month of the initial start-up of the Phoenix burner in late 1995. Tuning of the burners took place in the fall of 1995. During the tuning phase, Phoenix was unwilling to pay the liquidated damage on the windbox-to-furnace differential.

Phoenix could only work on the George Neal Station Unit 2 power plant when it was "off-line" and shut down. This limited Phoenix to working generally during scheduled maintenance or when significant work was being done on the plant. The scheduled outages occurred only during multi-months intervals.

In the spring of 1996, Phoenix installed a front over-fire air system at the Unit 2 power plant. This added air injection at the front of the boiler to go along with the rear over-fire air system. Phoenix returned to the Unit 2 power plant in the fall of 1996 in order to "tune" its installation. Phoenix returned again to Unit 2 power plant in the spring of 1997. On this occasion, Phoenix installed coal pipe balancing orifices on the burners.

In 1997, MidAmerican retained from Phoenix the amount due on the remaining contract balance, $242,782.71, because it believed that Phoenix had not completed its work on the project and had not performed the conditions required by the contract for payment of the retainage.

On April 14, 1999, MidAmerican formally notified both Phoenix and Great American that it was considering declaring Phoenix to be in default on the contract:

MidAmerican hereby provides notice to the Surety and the Contractor that it is now considering declaring the Contractor in default under the Contract. This letter also serves as a request and an attempt to arrange a conference with the Contractor and the Surety to discuss methods of performing the Contract so that the Contractor can meet and satisfy the performance guarantees and other requirements of the Contract.

MidAmerican Letter of April 14, 1999, attached as Exhibit "9" to MidAmerican's Appendix, at *68.

On April 26, 1999, Great American sent MidAmerican a letter acknowledging receipt of the April 14th letter and indicating that it intended to investigate the matter under a reservation of rights. On May 11, representatives of Great American met

with MidAmerican's representatives. On May 27, 1999, MidAmerican sent a letter to Phoenix in which MidAmerican formally declared Phoenix to be in default of the contract. The May 27th letter from MidAmerican states in pertinent part:

> MidAmerican by this letter is hereby providing notice to the Contractor that the Contractor is in default under the Contract and as such MidAmerican has elected to exercise its right to terminate the Contract pursuant to Article 14 of the General Conditions of the Contract. The following reasons, without limitation exist to justify MidAmerican's termination of the Contract:
>
> 1. Contractor has committed a material breach of the Contract; and
>
> 2. Contractor has persistently and repeatedly refused to conform to the Contract Documents and Contract Implementation Documents.
>
> Without intending to limit the generality of the foregoing, Contractor has (a) failed to meet the Performance Requirements of the Contract, in that the level of CO exceeds the guaranteed amount while maintaining the $NO_x$ emissions with the guarantee at all operating conditions (see Section 5.2 on page PR–11); (b) failed to meet the fouling, slagging and waterwall corrosion guarantee that states "No unstable flame pulsations at the burner" (see Section 2.04 on page 1B–9); (c) failed to conform to various warranties and guarantees set forth in the Contract as the Contractor's work with respect to the installation of the rear OFA duct system is not free from defects as tears have and are occurring in the expansion joints; (d) failed to provide all drawings and documents (including, without limitation, final O & M manuals revised to include the as-built condition and complete engineering/fabrication drawings in CAD format); and (e) failed to complete all the Work required by the Contract in accordance with the Contract.

MidAmerican Letter of May 27, 1999, attached as Exhibit "12" to MidAmerican's Appendix, at *74–75.

On February 7, 2000, MidAmerican filed this lawsuit, in which it alleges breach of the contract by Phoenix. MidAmerican used and operated Phoenix's burners at its George Neal Station Unit 2 power plant before making modifications in March of 2000. During the time that MidAmerican operated the Phoenix burners, the burners were not the subject of any regulatory or administrative action against MidAmerican. During the period of time that MidAmerican operated the Phoenix burners, MidAmerican did not regularly monitor or test for levels of CO emissions. MidAmerican did not consider the CO levels to be sufficiently high to warrant continuous monitoring.

In March of 2000, MidAmerican had a company, RJM, change the burners at its George Neal Station Unit 2 power plant. The RJM changes adopted a different standard than the Phoenix contract for CO emissions, with the RJM burners to maintain a level below 200 ppm CO emissions.

MidAmerican never tested the Phoenix burners at or over 4.0% oxygen dry to determine if the burners could meet the $NO_x$ and CO requirements and whether liquidated damages should be assessed against Phoenix as provided in the contract and in lieu of a refund of the bid price.

### 2. Additional facts related to motion to admit evidence

In October of 1999, Great American had FBT Engineering, Inc. examine and conduct testing of MidAmerican's George Neal Station Unit 2 power plant. Before Great American could have such testing conducted, MidAmerican required Great American to enter into a stipulation that

proscribed Great American from using the testing results in any subsequent litigation or as a basis for an expert opinion on the issues of liability and damages under the performance bond. The stipulation provides as follows:

9. **GAIC stipulates that Data Will not be Used as Evidence.** GAIC stipulates that unless MidAmerican waives this stipulation, it will not use these test results or data gathered for the purposed by FBT as evidence in any later judicial proceeding or arbitration to adjudicate liability and damages under the performance bond. The test results will not be used by GAIC as the basis for expert opinion on the issues of liability and damages under the performance bond, provided however, that GAIC's expert(s) may rely on these results to determine the need in the future for additional testing that may relate to the issues of liability and damages. The results of any such future testing and expert opinion based on that testing are not subject to this stipulation and cannot be excluded or disallowed because the need for such future testing was based on the results of the testing provided for under the terms of this Agreement. This stipulation is limited to the testing proposed under the terms of this agreement, and does not waive or limit the right of GAIC, in any future proceeding, to seek or demand other or additional testing or to seek to duplicate the test plan or procedure contemplated under the terms of this Agreement.

Terms and Conditions For Testing, at ¶ 9, attached as Exhibit "1" to Great American's Motion To Admit Evidence Of Certain Test Results. Great American claims that FBT's testing revealed that the $NO_x$ levels required under the contract between Phoenix and MidAmerican for MidAmerican's George Neal Station Unit 2 power plant could be achieved when the unit was operated at approximately 4.4% $O_2$.

In mid-February of 2000, MidAmerican disclosed that remodeling of MidAmerican's George Neal Station Unit 2 power plant was to commence three weeks later, beginning on March 3, 2000, during a planned outage. It was impossible for FBT to reschedule additional testing of the Unit 2 power plant with less than three weeks notice. In March of 2000, MidAmerican had RJM commence remodeling of MidAmerican's George Neal Station Unit 2 power plant. Under the terms of its contract with MidAmerican, RJM agreed to make modifications to the Unit 2 power plant such that it would operate a 200 PPM CO with an average $O_2$ level of 2.9% to 3.2%. As a result of RJM's modifications to the Unit 2 power plant, tests can· no longer be performed under the conditions of the Phoenix contract.

## II. LEGAL ANALYSIS

### A. Motion To Strike

The court initially takes up Great American's Motion to Strike The Affidavit of Leon Gertsch. Gertsch's affidavit is attached to MidAmerican's Appendix filed on August 1, 2001. Gertsch is MidAmerican's supervising engineer. Great American asserts in its motion that Gertsch's affidavit should be stricken because it contains facts regarding Phoenix's project for the modification and improvement of the combustion and boiler system at MidAmerican's George Neal Station Unit 2 power plant that occurred before he became involved in the project. Great American also argues that Gertsch's affidavit should be stricken because, although Gertsch was not involved in the negotiations which occurred between Great American and MidAmerican with respect to the legal terms contained in the testing agreement, his affidavit nonetheless contains details regarding those negotiations. Finally, Great American argues that his affidavit must be

stricken because it contains inadmissible hearsay, specifically Gertsch's affidavit's revelations regarding a letter from Scott Leo. MidAmerican has resisted Great American's motion and asserts that the portion of Gertsch's affidavit containing the statements concerning Leo's letter, paragraphs 36 and 37, are not being offered in resistance to Great American's motion for summary judgment but instead are offered in resistance to Great American's motion to admit evidence. MidAmerican also argues that the only facts contained in other challenged paragraphs of Gertsch's affidavit are either uncontested or facts based on Gertsch's personal knowledge.

■ Federal Rule of Civil Procedure 56(e) states that affidavits supporting a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). The Eighth Circuit Court of Appeals has held that "[a]ffidavits in support of summary judgment must be made on personal knowledge and contain admissible evidence. Where an affidavit does not meet this standard, it is subject to a motion to strike." *McSpadden v. Mullins,* 456 F.2d 428, 430 (8th Cir.1972) (citations omitted); *accord Hanke v. Global Van Lines, Inc.,* 533 F.2d 396, 398 (8th Cir. 1976) (holding that defendant's attorney's affidavit which appeared to be based on hearsay was entitled to no consideration); *Miller v. Solem,* 728 F.2d 1020, 1026 (8th

Cir.) (holding that affidavits containing hearsay statements failed to comply with Rule 56(e)'s requirement that the facts set out in affidavits be admissible in evidence), *cert. denied,* 469 U.S. 841, 105 S.Ct. 145, 83 L.Ed.2d 84 (1984); *see Logan v. Denny's Inc.,* 259 F.3d 558, 569 (6th Cir.2001) (ruling "'that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded.'") (quoting *Moore v. Holbrook,* 2 F.3d 697, 699 (6th Cir.1993)); *see also Johnson v. Nordstrom, Inc.,* 260 F.3d 727, 735 (7th Cir.2001); *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 968–69 (6th Cir.1991).

■ Gertsch avers in his affidavit that "he has knowledge of the facts set forth in this affidavit and that the same are true as he verily believes." Gertsch Aff. at p. 1. However, it is unclear whether Gertsch's affidavit is based on personal knowledge of the facts surrounding events related to the Phoenix modifications to the George Neal Station Unit 2 power plant that occurred prior to 1997. Gertsch declares in his affidavit that "[s]ince at least 1997, Affiant has been personally involved in the Neal 2 Low NO$_x$ burner conversion project and has worked with both Phoenix Combustion, Inc. and Great American Insurance Company in connection with that project." Gertsch Aff. at ¶ 2. MidAmerican argues that the assertions contained in paragraphs 12 and 14 are based on Gertsch's personal knowledge and directs the court's attention to portions of Gertsch's transcript.[1] During Gertsch's deposition the following colloquy occurred:

---

1. Gertsch declares in paragraphs 12 and 14 of his affidavit that:

12. In the Spring of 1996 Phoenix installed a front OFA system. This added air injection at the front of the boiler to go along with the already installed rear OFA system. After installation of the front OFA system, Phoenix conducted a series of performance tests. These tests, conducted in the summer of 1996, showed that, while the front OFA system had improved the combustion process, the boiler still did not meet emission requirements.

. . . .

14. Phoenix returned to Neal 2 in the Fall of 1996 and attempted to "tune" its installation. This tuning, too, was unsuccessful. Additional tests conducted that

Q. Okay. Paragraph 12, "In the spring of 1996"—and again, this would be something you learned from the records. Is that correct? Because you didn't have personal knowledge or you were not involved in the project at this time. Is that correct?

A. Well, I—I could—I was there working on the Neal 3 project, so I could see that they were installing— ·

Q. Okay. You could observe the installation.

A. Yes.

Q. They installed a front overfire air system. And you reference at the end of paragraph 12 that, "While the front overfire system had improved the combustion process, the boiler still did not meet emission guarantees."

Now, were you involved when the tests were conducted?

A. Not at that time, no.

Gertsch Dep. at p. 60. Later in his deposition, the following exchange occurred:

Q. Okay. Well, maybe we can fit it in the time line as we run through your affidavit here.

Paragraph 14, "Phoenix returned to Neal 2 in the fall of '96 and attempted to 'tune' its installation."

Now, this is the point at which you first become involved. Is that correct?

A. Yes. That—that's—that's about the time I remember getting involved.

Q. And you indicate "Additional tests conducted that fall again indicated non-compliance with the emissions targets."

And that's based on your observation and the test results that were obtained?

A. Yes.

Gertsch Dep. at pp. 64–65. Upon reviewing these portions of Gertsch's deposition testimony, the court concludes that while Gertsch did have personal knowledge of the installation work contained in paragraph 12 and the actions detailed in paragraph 14, Gertsch did not have personal knowledge of the testing described in paragraph 12.

Therefore, the court grants Great American's motion to strike with respect to the testing described in paragraph 12 of Gertsch's affidavit but denies it as to the remaining portions of paragraph 12 and all of paragraph 14. The court further grants Great American's motion to strike with respect to Gertsch's factual averments related to the Phoenix modifications to the George Neal Station Unit 2 power plant that occurred prior to spring of 1996.

This decision, however, still leaves unresolved whether paragraphs 36 and 37 of Gertsch's affidavit should be stricken. MidAmerican points out that these paragraphs are not referred to in its resistance to Great American's motion for summary judgment but rather relate only to MidAmerican's resistance to Great American's motion to admit evidence. As a result, MidAmerican asserts that the Rule 56(e) requirements for documents submitted in support of a motion for summary judgment are inapplicable to this portion of Gertsch's affidavit. Instead, MidAmerican argues that the more relaxed standards of Federal Rule of Evidence 104(a) are applicable.

Federal Rule of 104(a) provides that:

(a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the

Fall again indicated non-compliance with the emissions targets.

Gertsch Aff. at ¶¶ 12, 14.

rules of evidence except those with respect to privileges.

FED. R. EVID. 104(a). Great American objects to paragraphs 36 and 37 of Gertsch's affidavit based on hearsay. The court rejects Great American's hearsay argument because under Federal Rule of Evidence 104(a), the court is not bound by the prohibitions contained in the Federal Rules of Evidence against the use of hearsay when making a determination regarding the admissibility of evidence. "When making a preliminary determination..., a judge may rely upon a hearsay statement, giving 'it appropriate weight based on his or her judgment and experience.'" *Resolution Trust Corp. v. Massachusetts Mut. Life Ins. Co.*, 200 F.R.D. 183, 195 (W.D.N.Y. 2001) (discussing determination of the existence and waiver of the work-product privilege and quoting *Cooper Hospital/University Medical Center v. Sullivan*, 183 F.R.D. 119, 129 (D.N.J.1998)); *see Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (citing Rule 104(a) for the proposition that in determining questions of admissibility, the court is not bound by the rules of evidence, except those with respect to privileges, and may therefore consider hearsay). Therefore, the court denies this portion of Great American's motion to strike. The court, of course, will not consider paragraphs 36 and 37 of Gertsch's affidavit in its analysis of Great American's motion for summary judgment. Having so concluded, the court now proceeds to examine the merits of defendant Great American's motion for summary judgment.

### B. Motion For Summary Judgment

#### 1. Standards for summary judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R. CIV. P. 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo*, 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill*, 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.*, 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part*, 202 F.3d 1035 (8th Cir.), *cert. denied*, 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.*, 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd*, 205 F.3d 1347 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time · after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377 (same). With these standards in mind, the court turns to consideration of defendant Great American's Motion For Summary Judgment on Count I Of The Complaint.

### 2. Analysis of arguments

#### a. Liquidated damages provision

Great American initially seeks summary judgment on Count I of the complaint on the ground that the liquidated damages segment of the contract under which MidAmerican seeks recovery is an unenforceable penalty. Under Iowa law, "[w]hether a contract provision is a valid liquidated damages clause or an unenforceable penalty is a question of law for the court." *Aurora v. Michael Albert, Inc.*, 548 N.W.2d 153, 155 (Iowa 1996); *Rohlin Constr. Co. v. City of Hinton*, 476 N.W.2d 78, 79 (Iowa 1991). However, there is no definitive statement by the Iowa Appellate courts on the issue of which party has the burden of proof with regard to the enforceability of a liquidated damages provision. When the highest state court has not issued a definitive ruling on the precise issue at hand, the federal courts may refer to analogous decisions, considered dicta, scholarly works, or other reliable sources to ascertain how the state's highest court would rule on the issue. *David v. Tanksley*, 218 F.3d 928, 930 (8th Cir.2000) (holding that when the state's highest court "has not clearly spoken on an issue, we may consider 'relevant state precedent, analogous decisions, considered dicta, . . . and any other reliable data.'") (quoting *Bass v. General Motors Corp.*, 150 F.3d 842, 847 (8th Cir.1998)). The prevailing rule is that the party challenging the enforceability of a liquidated damages clause has the burden of proving that it is a penalty. *Honey Dew Assocs., Inc. v. M & K Food Corp.*, 241 F.3d 23, 28 (1st Cir. 2001); *see* Joseph F. Brodley & Ching-to Albert Ma, *Contract Penalties, Monopolizing Strategies, and Antitrust Policy*, 45 STAN. L. REV. 1161, 1179 (1993) ("[T]he trend toward increased enforcement of stipulated damages is also encouraged by a shifting of the burden of proof to the party

who asserts the existence of an unlawful penalty. The shifted burden of proof, enacted by statute in some states, has probably now become the majority rule, replacing the earlier rule requiring the enforcer of a contract to prove the absence of an unlawful penalty."); Melvin Aron Eisenberg, *The Limits of Cognition and the Limits of Contract*, 47 STAN. L. REV. 211, 236 (1995) ("[A] liquidated damages provision should relieve the plaintiff of the burden of proving damages, by shifting to the defendant the burden of establishing that the liquidated damages provision is unenforceable."). Given the dearth of Iowa authority on the subject to the contrary and the authorities listed above, the court concludes that the Iowa Supreme Court would assign the burden of proving the unenforceability of a liquidated damages clause to the party raising that defense, which here is defendant Great American.

■ The Iowa Supreme Court recognized the trend of favoring liquidated damages clauses in *Rohlin:*

"In the past, we disfavored the use of liquidated damage clauses and favored interpretation of contracts that make stipulated sums penalties. Later, we relaxed this penalty rule and recognized that parties may fix damages by contract when the amount of damages is uncertain and the amount fixed is fair."

*Aurora*, 548 N.W.2d at 155 (quoting *Rohlin*, 476 N.W.2d at 79). The Iowa Supreme Court adopted the standard for liquidated damages laid out in Restatement (Second) of Contracts § 356(1):

"Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty."

*Rohlin*, 476 N.W.2d at 79 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 356(1) (1981)).

■ **i. Test for liquidated damages.** In *Rohlin*, the Iowa Supreme Court also adopted the Restatement's test for determining whether the amount of fixed or liquidated damages is unenforceable as a penalty:

Under the test stated in Subsection (1), two factors combine in determining whether an amount of money fixed as damages is so unreasonably large as to be a penalty. The first factor is the anticipated or actual loss caused by the breach. The amount fixed is reasonable to the extent that it approximates the actual loss that has resulted from the particular breach, even though it may not approximate the loss that might have been anticipated under other possible breaches. Furthermore, the amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss. The second factor is the difficulty of proof of loss. The greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty, the easier it is to show that the amount fixed is reasonable. To the extent that there is uncertainty as to the harm, the estimate of the court or jury may not accord with the principle of compensation any more than does the advance estimate of the parties. A determination whether the amount fixed is a penalty turns on a combination of these two factors. If the difficulty of proof of loss is great, considerable latitude is allowed in the approximation of anticipated or actual harm. If, on the other hand, the difficulty of proof of loss is slight, less latitude is allowed in that approximation. If, to take an extreme case, it is clear that no

loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable.

*Rohlin,* 476 N.W.2d at 80 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 356(1), cmt. b). The court will address each of these factors in turn.

■ *ii. Actual loss or damage caused by the breach.* The court turns first to the question of the actual loss or damage caused by the breach. *See Aurora,* 548 N.W.2d at 157; *Rohlin,* 476 N.W.2d at 79. Great American asserts that the amount called for in the contract for liquidated damages, $3,111,235, is disproportionate to any actual damages suffered by MidAmerican and therefore unreasonable. Great American points to the fact that after using the Phoenix burners for four years, MidAmerican only spent between $800,000 and $900,000 to replace the Phoenix burners, a sum less than one-third the liquidated damages provision. MidAmerican counters that the liquidated damages provision is reasonable because it spent $2.9 million dollars on Phoenix's modifications to its boiler and ended up with a boiler which did not meet the contract specifications. MidAmerican argues that since it had a working boiler unit before Phoenix's modifications were made, albeit a boiler with higher emissions levels, the failure of the Phoenix modifications to the boiler to meet the emissions requirements called for in the contract rendered MidAmerican's expenditure of the $2.9 million dollars on the Phoenix modifications fruitless.

Here, although the question of whether the stipulated damages provision is enforceable is a question of law for the court, determination of that question requires the resolution of underlying factual disputes. The difficulty the court encounters in assessing this factor lies in the fact that while the court knows the amount MidAmerican spent to replace the Phoenix burners and that MidAmerican claims that it has incurred expenses to date of more than $1,450,000 to correct problems caused by Phoenix's work, the court cannot determine from the record what value MidAmerican obtained from Phoenix modifications. Clearly, MidAmerican obtained the use of the Phoenix burners for four years. In addition, in its modifications to MidAmerican's George Neal Station Unit 2 power plant Phoenix provided a working front over fire system and working air registers. While MidAmerican contends that the value of these modifications is offset by the need to replace Phoenix's burners, the value of these improvements to the George Neal Station Unit 2 power plant cannot be ascertained from the summary judgment record before the court. Thus, because the court cannot conclude on the record before it the actual loss or damage caused by Phoenix's breach of the contract, the court is unable to make a determination as to whether the contract's liquidated damages provision constitutes an unenforceable penalty. Therefore, this portion of Great American's motion for summary judgment is denied. Although unnecessary in light of the court's determination on the first factor, the court will briefly address the second factor in the test for determining whether the amount fixed for liquidated damages is unenforceable as a penalty.

*iii. Difficulty of proof of loss.* The second factor a court must consider in determining whether the amount fixed in the contract for liquidated damages is unenforceable as a penalty is the difficulty of proof of loss. *See Aurora,* 548 N.W.2d at 157; *Rohlin,* 476 N.W.2d at 79. Great American asserts that MidAmerican's damages are not difficult to ascertain. Great American argues that any damages MidAmerican incurred in the operation of the Phoenix burners would relate to MidAmerican's increased costs to operate the George Neal Station Unit 2 power plant.

MidAmerican concedes that what it paid to have the Phoenix modifications installed is readily determinable. MidAmerican, however, argues that the actual value of the Phoenix modifications is difficult to ascertain in light of the fact that while it paid $2.9 million for the Phoenix modifications, after it replaced the Phoenix burners, it was left with only a working front over fire air system and working air registers. Moreover, MidAmerican contends that an assessment of its damages requires considering the costs of removing the Phoenix installed rear-over fire air system, the cost of the new burner tips to replace the existing Phoenix tips, the costs of using high-price coal to operate the George Neal Station Unit 2 power plant while Phoenix conducted repeated testing on the plant, the cost of extra unit outages incurred for Phoenix to do remedial and corrective work at the plant, and the internal administrative and management time devoted to dealing with the Phoenix modifications to the George Neal Station Unit 2 power plant. While the cost of many of the items listed by MidAmerican appear to be easily ascertainable, the court cannot ascertain from the summary judgment record the difficulty in accessing such items as the cost of extra unit outages incurred in order for Phoenix to do remedial and corrective work at the plant. Thus, being mindful that the court must view all the facts in the light most favorable to the nonmoving party, MidAmerican, and give it the benefit of all reasonable inferences that can be drawn from the facts, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the court concludes that while it views this as an extremely close question, the court finds that MidAmerican has succeeded in generating a genuine issue of material fact on the question of the difficulty of proof of loss. Therefore this portion of Great American's is denied.

### b. Time barred

Great American also asserts that this action is time barred under the terms of the performance bond. Great American contends that MidAmerican was required to bring suit within two years after MidAmerican believed that Phoenix was in default on the contract. MidAmerican contends that the two-year limitations period did not begin to run when MidAmerican first thought Phoenix was in default under the contract. MidAmerican argues that the two-year limitations period did not begin to run until it was unwilling to waive a default or that the contractor was unable or unwilling to remedy a default. MidAmerican asserts that none of these events occurred until the end of 1998 when it determined that Phoenix was irretrievably in default.

 Under Iowa law, parties to a contract are permitted to designate a limitations period shorter than the statutory period for filing actions based upon a contractual obligation. *See Hamm v. Allied Mut. Ins. Co.*, 612 N.W.2d 775, 778 (Iowa 2000). In addition, under Iowa law, "when language in an insurance policy is ambiguous, requires interpretation or is susceptible to two equally plausible constructions, we will adopt the construction that is most favorable to the insured." *Id.; Allied Mut. Ins. Co. v. Costello*, 557 N.W.2d 284, 286 (Iowa 1996); *West Bend Mut. Ins. Co. v. Iowa Iron Works, Inc.*, 503 N.W.2d 596, 598 (Iowa 1993); *Benzer v. Iowa Mut. Tornado Ins. Ass'n*, 216 N.W.2d 385, 388 (Iowa 1974). This principle of construction is compelled because insurance policies are in the nature of adhesion contracts. *West Bend Mut. Ins. Co.*, 503 N.W.2d at 598; *A.Y. McDonald Indus. v. INA*, 475 N.W.2d 607, 619 (Iowa 1991). Additionally, "an insurer has a duty to define any limitations or exclusionary clauses in clear and explicit terms." *Hamm*, 612 N.W.2d at 778; *see*

*Costello*, 557 N.W.2d at 286; *West Bend Mut. Ins. Co.*, 503 N.W.2d at 598. Therefore, if the limitations period in the bond does apply to this action, any ambiguities in its language must be construed in MidAmerican's favor.

The performance bond contains the following limitations period on litigation:

> 9 Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in which the work or part of the work is located and shall be instituted within two years after the Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligation under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

Performance Bond at ¶ 9, attached as Exhibit "A" to Great American's Answer. Thus, under the terms of the performance bond, the two year limitation period on litigation contained in the bond commences upon the earliest occurrence of one of three events: (1) the contractor defaulting; (2) the contractor ceasing work; or, (3) the surety's refusal or failure to perform its obligation under this bond. Here, Great American's arguments are centered solely on the first of these three events, Phoenix's default. The performance bond defines a contractual default as:

> 12.3 Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract.

Performance Bond at ¶ 12.3.

Great American asserts that Phoenix's default here occurred in 1997 when MidAmerican believed that Phoenix could not meet the contracts $NO_x$ requirements even with a violation of the contract's $O_2$ requirements. In support of its argument, Great American points to the fact that in 1997, MidAmerican retained from Phoenix the amount due on the remaining contract balance, $242,782.71, because it believed that Phoenix had not completed its work on the project and had not performed the conditions required by the contract for payment of the retainage. MidAmerican's response is that a "contractor default" under the bond does not result when a possible default is first discovered. Instead, MidAmerican argues that a contractor default does not occur until that point in which the owner concludes that it is unwilling to waive a default or the contractor is unwilling or unable to remedy it. MidAmerican asserts that this event did not arise until the end of 1998, after the contract performance tests were done, when MidAmerican concluded that Phoenix was irretrievably in default under the contract.

■ Here, the court finds the language of the bond to be ambiguous as to the occurrence of a contractor default in the situation where there has been a breach of the terms of the underlying contract but the contractor remains engaged in corrective measures. As noted above, under Iowa law, because the bond is ambiguous, the court will adopt the construction that is most favorable to the insured, MidAmerican. *Hamm*, 612 N.W.2d at 778; *Allied Mut. Ins. Co.*, 557 N.W.2d at 286 (Iowa 1996); *West Bend Mutual*, 503 N.W.2d at 598; *Benzer*, 216 N.W.2d at 388. The court notes that under the bond's definition of contractor default, such an event only arises from a failure of the contractor "which has *neither been remedied* nor waived, to perform or otherwise to comply with the terms of the Construction Contract." Performance Bond at ¶ 12.3 (emphasis added). Because the

bond speaks in terms of unremedied failures on the part of the contractor, logic would dictate that while a contractor is actively involved in remedying a failure, a contractor default would not result. Here, even after MidAmerican did, in 1997, retain the amount due Phoenix on the remaining contract balance, $242,782.71, because it believed that Phoenix had not completed its work on the project and had not performed the conditions required by the contract for payment of the retainage, Phoenix continued to take measures to correct its modifications through April of 1998, when it conducted burner testing, made recommendations for certain corrective measures, and fabricated and delivered expansion ducts for the rear over fire air system. Because these corrective events occurred after MidAmerican retained the remaining contract balance, the court concludes that a contractor default by Phoenix did not occur until some point after April of 1998, when the results of these corrective measures were deemed by MidAmerican to be a failure. Thus, the contractor default, which triggered the running of the period of limitations contained in the performance bond, occurred no earlier than the end of April 1998. Since this lawsuit was filed on February 7, 2000, the court concludes that MidAmerican brought suit within two years of the "Contractor Default" as required under the terms of the performance bond. Therefore, this lawsuit is not time barred under the terms of the performance bond and this portion of Great American's motion for summary judgment is also denied.

### C. Motion To Admit Evidence

As noted above, Great American advances three theories as to why it should be granted relief from the written stipulation between it and MidAmerican restricting the use of testing results: that the stipulation is unenforceable because there was no consideration for the agreement;

that enforcement of the stipulation would be inequitable in light of changes made to the burners by MidAmerican which prevented Great American from conducting further testing of the burner units; and that the test results should be admitted to rebut a design defect claim advanced by MidAmerican. The court will take up each of these arguments *seriatim.*

### 1. Lack of consideration

 Initially, Great American asserts that the stipulation is unenforceable due to a lack of consideration. Consideration is an essential element of any binding contract. *Magnusson Agency v. Public Entity Nat'l Co.-Midwest,* 560 N.W.2d 20, 26 (Iowa 1997); *Dullard v. Schafer,* 251 Iowa 274, 100 N.W.2d 422, 427 (Iowa 1960). A lack of consideration means no contract was ever formed. *Federal Land Bank of Omaha v. Woods,* 480 N.W.2d 61, 65 (Iowa 1992); *Johnson v. Dodgen,* 451 N.W.2d 168, 172 (Iowa 1990); *Hart v. Hart,* 160 N.W.2d 438, 444 (Iowa 1968). Thus, the issue the court must address is whether the purported stipulation was supported by consideration as required by Iowa law. *See In re Marriage of Farr,* 542 N.W.2d 828, 832 (Iowa 1996); *Broyles v. Iowa Dep't of Social Servs.,* 305 N.W.2d 718, 723 (Iowa 1981). Consideration includes either a benefit to the promisor or a detriment to the promisee. *Magnusson Agency,* 560 N.W.2d at 26; *In re Marriage of Farr,* 542 N.W.2d at 832; *Hubbard Milling Co. v. Citizens State Bank,* 385 N.W.2d 255, 258 (Iowa 1986); *Doggett v. Heritage Concepts, Inc.,* 298 N.W.2d 310, 311 (Iowa 1980). "Consideration may consist of a performance or a return promise, and it must be 'bargained for.'" *Magnusson Agency,* 560 N.W.2d at 26; *In re Marriage of Farr,* 542 N.W.2d at 832. Under Iowa law, consideration is presumed when an agreement sought to be enforced is in writing and signed by the

party to be bound. *Insurance Agents, Inc. v. Abel,* 338 N.W.2d 531, 534 (Iowa Ct.App.1983); *Lovlie v. Plumb,* 250 N.W.2d 56, 61 (Iowa 1977); *Sisson v. Janssen,* 244 Iowa 123, 56 N.W.2d 30, 34 (Iowa 1952). As the party asserting the defense of lack of consideration here, Great American has the burden of proof on this issue. *Hubbard Milling Co.,* 385 N.W.2d at 259; *Abel,* 338 N.W.2d at 534.

 In this case there is no doubt that the stipulation between MidAmerican and Great American is supported by consideration. In exchange for the stipulation limiting the use of any test results obtained, MidAmerican permitted Great American to have its agent conduct tests at its MidAmerican's George Neal Station Unit 2 power plant. Under these circumstances, Great American obtained the benefit of having permission to conduct testing at MidAmerican's George Neal Station Unit 2 power plant while MidAmerican suffered the detriment of having its operations at the Unit 2 power plant disrupted in order for the testing to be carried out. Therefore, the court concludes that Great American has failed to establish that the stipulation is unenforceable due to a lack of consideration and this portion of Great American's motion is denied.

### 2. *Inequity of enforcement*

Initially, Great American also contends that enforcement of the stipulation is inequitable given that it is unable to conduct further testing on MidAmerican's George Neal Station Unit 2 power plant due to MidAmerican's modifications of the Unit 2 power plant shortly after filing this lawsuit. Great American asserts that enforcement of the stipulation under such circumstances would be inequitable and award MidAmerican for engaging in "gamesmanship" and "possible spoilation of evidence."

 The Iowa Supreme Court observed over eighty years ago that:

Courts of equity will not undertake to make contracts for parties, or to revise them. Equity recognizes, as the law does, that parties are entitled to the benefits of their contracts and their bargain. But bad bargains will be often interfered with by courts, when there is proof of fraud or deceit, or the taking of undue advantage of another because of infirmities. The refusal to enforce a contract specifically is not based then, upon the mere ground that the bargain is improvident or unfair, but because of other influences which have worked their way into the making of the contract, which show that one or the other has been circumvented into the making of the contract, which renders it inequitable now to compel him to abide by the terms and perform as stipulated.

*Nelson v. Robinson,* 189 Iowa 1076, 178 N.W. 416, 417 (Iowa 1920). Iowa law also holds that a party to a contract can breach the implied duty of good faith even if that party abides by the express and unambiguous terms of that contract if that party acts in bad faith or engages in some other form of inequitable conduct. *See Engstrom v. State,* 461 N.W.2d 309, 313 (Iowa 1990) ("A contract imposes upon each party a duty of good faith in its performance and enforcement."); *see also Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 453 (Iowa 1989) (recognizing that under Iowa law there is an "implied duty of good faith and fair dealing" in all contracts). The Iowa Supreme Court has looked to the Restatement's discussion of the meaning of good faith:

"The phrase 'good faith' is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of

855

types of conduct characterized (in other contexts) as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness."

*Kooyman v. Farm Bureau Mut. Ins. Co.,* 315 N.W.2d 30, 34 (Iowa 1982) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205, comment a (1981)).

Here, after entering into the stipulation with MidAmerican, Great American's agent was permitted to conduct testing at MidAmerican's George Neal Station Unit 2 power plant in October of 1999. This was five months after MidAmerican had formally declared Phoenix to be in default under the contract and given notice to Great American of Phoenix's default. When, in mid-February of 2000, MidAmerican gave Great American notice of the fact that it was going to commence changing the burner tips on the Unit 2 in three weeks, Great American had taken no steps to conduct further testing of the Unit 2 power plant despite the fact that four months had passed since FBT Engineering, Inc.'s testing of MidAmerican's George Neal Station Unit 2 power plant. Moreover, the record is devoid of evidence that MidAmerican knew or should have known that three weeks notice was insufficient time for FBT to conduct further testing at the Unit 2 power plant. In the absence of such evidence, the court does not find enforcement of the stipulation to be inequitable, and this segment of Great American's motion is denied.

### 3. Design defect

Finally, Great American argues that the test results must be admitted to rebut MidAmerican's claim that there were "design deficiencies" with Phoenix's modifications to MidAmerican's George Neal Station Unit 2 power plant. Great American asserts that this claim was not mentioned in the notice of default and only arose after this lawsuit was filed. Great American asserts that the FBT test results

constitute direct evidence that there is no design flaw in the Phoenix burners which prevents them from meeting the emissions guarantees. The stipulation, however, clearly and unequivocally provides that Great American "will not use these test results or data gathered for the purposed by FBT *as evidence in any later judicial proceeding or arbitration to adjudicate liability and . damages under the performance bond.*" Terms and Conditions For Testing, at ¶ 9 (emphasis added). Given these broad restrictions on the use of FBT's test results, litigation over any claim of design deficiencies under the performance bond would fall within its orbit. MidAmerican does not direct the court to any authority which required MidAmerican to make a pre-litigation disclosure to Great American of all its legal theories. Moreover, Great American does not explain what additional actions it would have taken if it had know of MidAmerican's design deficiencies claim prior to the commencement of this lawsuit. Under such circumstances, the court does not find the stipulation to be unenforceable, and this segment of Great American's motion is also denied.

### III. CONCLUSION

The court initially **grants in part and denies in part** Great American's Motion to Strike The Affidavit of Leon Gertsch. The court concludes that while Gertsch did have personal knowledge of the installation work contained in paragraph 12 and the actions detailed in paragraph 14, Gertsch did not have personal knowledge of the testing described in paragraph 12. Thus, the court grants Great American's motion to strike with respect to the testing described in paragraph 12 of Gertsch's affidavit but denies it as to the remaining portions of paragraph 12 and all of paragraph 14. The court further grants Great American's motion to strike with respect

to Gertsch's factual averments related to the Phoenix modifications to the George Neal Station Unit 2 power plant that occurred prior to spring of 1996. With respect to paragraphs 36 and 37 of Gertsch's affidavit, the court denies Great American's motion to strike. The court, however, will not consider paragraphs 36 and 37 of Gertsch's affidavit in its analysis of Great American's motion for summary judgment. With respect to Defendant Great American's Motion For Summary Judgment on Count I Of The Complaint, the court concludes that genuine issues of material fact have been generated on the question of whether the stipulated damages provision is enforceable. The court further concludes that this lawsuit is not time barred under the terms of the performance bond. Therefore, Defendant Great American's Motion For Summary Judgment on Count I Of The Complaint is **denied.** Finally, Great American's Motion To Admit Evidence Of Certain Test Results is **denied.** The court finds that the written stipulation between Great American and MidAmerican restricting the use of testing results is supported by consideration. The court further finds that enforcement of the stipulation would not be inequitable and that the test results need not be admitted to rebut a design defect claim.

**IT IS SO ORDERED.**